Lyman H. Smith, J.
Pursuant to subdivision (2) of section 454 of the Code of Criminal Procedure, the Department of Mental Hygiene seeks the release of the above-named defendant from status as a patient at Marcy State Hospital, Utica, N. Y.
On June 8, 1966, the defendant was indicted for the crime of murder in the first degree for the shotgun slaying of his girl friend on the night of May 28, 1966. To this indictment he entered a plea of “ not guilty by reason of insanity.” After trial, which ended March 8,1968, the jury disagreed. The court declared a mistrial. Upon stipulation of both People and defendant the issues were submitted on the trial record to the court without a jury. The court found the defendant ‘ ‘ not guilty by reason of insanity ” and, on June 24, 1968, committed the defendant to the custody of the Commissioner of Mental Hygiene. Until the advent of these proceedings the defendant has remained a patient at the Marcy State Hospital.
To assist the court in these proceedings and in compliance with subdivision (2) of section 454 of the Code of Criminal Procedure, the Commissioner of Mental Hygiene has submitted to the court a series of reports setting forth the defendant’s history together with summaries of various evaluations and examinations of the defendant, an opinion of his current mental status, the file covering his care and treatment while a patient at the hospital, and the conclusory opinion that the defendant may be discharged or released, ‘ ‘ for he is presently without danger to himself or others.”
Following the Commissioner’s request for discharge of the defendant from hospital custody, the court (the Hon. Ormand 1ST. G-aXiB, presiding) on March 18, Í970 appointed two qualified and independent psychiatrists to examine the defendant and report on the issue ‘ ‘ whether [the defendant may] safely be discharged as to himself and the community, and as to whether any condition should be imposed upon such release.” Since he had presided upon the original trial, Judge Gale disqualified himself in the instant proceeding (People v. Haynes, 30 A D 2d, 705) and transferred the same to this part (Sup. Ct., Part VT, Criminal) for hearing and disposition.
The appointed psychiatrists have duly reported to the court and a plenary hearing has been held in order that the court may now determine whether or not the defendant is to be released from hospital custody. (Cf. People v. Dally, 19 N Y 2d 27.) Parenthetically, it should be noted that the defendant did *216 not request a jury trial of the issue of his release and, when informed of his rights to one by the court, he and his counsel expressly waived such right.
These procedures and the hearings which have been held to determine the present issues of the mental status and social capabilities of the defendant bring into sharp focus the continuing difficulties that beset the disciplines of law and psychiatry where, on a field strewn with misconceptions and even mistrust, they meet by legislative mandate to determine when and how best to rehabilitate a criminal offender and at the same time protect society from such offender. (Cf. People v. Bailey, 21 N Y 2d 588; People v. Jackson, 20 A D 2d 170; People ex rel. Chumley v. Mancusi, 26 A D 2d 905.) Both disciplines are equally aware that they must also satisfy the demands of society to maintain modes of punishment and establish effective deterrents to criminal activities. (See L. J. Friedman, “No Psychiatry in Criminal Court ”, 56 Amer. Bar Assn. J. 242.)
On May 28,1966, the defendant, a brilliant university student, then age 19, and apparently in the grip of a psychotic episode (diagnosed upon trial by two qualified psychiatrists as “ schizophrenia, acute, undifferentiated ”), killed his 17-year-old sweetheart with a shotgun. As above indicated, he was thereafter adjudged ‘ ‘ not guilty by reason of insanity ’ ’ and hospitalized in accordance with the statute.
From the evidence adduced upon the hearing it is fair to state that it is the present consensus of the psychiatrists, including those of the hospital staff and both of the court-appointed psychiatrists (Drs. C. A. Del Cioppo and Ivan T. Vasey) that the defendant is “ without psychosis at the present time ”. The distinguished Director of Marcy State Hospital in a letter dated June 18, 1969, reported to the court that the defendant “ is presently without danger to himself or others.”
While all these physicians conclude that the subject may safely be returned to the community, all are equally agreed that there is little, if any, science that can be brought to the sensitive task of evaluating the probability that this defendant will be likely to do violence in the future. The result is, of course, that these polarized positions of psychiatric opinions, which, on the one hand recommend defendant’s return to the community, and on the other hand forthrightly and understandably refuse to predict his future, remain irreconcilable. Indeed, it is at this point, that the true role of the psychiatrists, vis-a-vis the law, is revealed. The law asks these dedicated people for expert opinion. It can ask no more. The ultimate determination must lie within the socio-legal discipline of the *217 court after careful consideration of the evidence and opinions submitted by these expert physicians.
Laying aside, for the moment, the troublesome and speculative issue of the predictability of the defendant’s future social behavior, it is clear in the instant case that the psychiatrists turn with more confidence, and without sacraficium intellectus, to the question of whether the defendant is treatable. All recommend that he continue to take and receive psychiatric therapy and direction. All are agreed that his maturation since the event of 1966 has changed him “ in many ways.” In sum, these experts agree that the defendant is treatable.
Turning then to the issue of the probability of recidivism, the court welcomes any light that psychiatry can shed upon this problem, bearing in mind that the testimony of any expert witness may be rejected either in whole or in part. In a matter as grave as the one here presented, the court should not lightly cast aside expert opinion. Although, it is for the court alone to balance the scales of justice between society and the individual, it should avail itself of all competent and relevant information that it can bring to bear on the issues.
Fortunately, the psychiatrists in the instant case have shed much light on the subject. They report favorably in this case that the defendant is an exceptional student, gifted with a superior intelligence. The psychologist’s report reveals a total I.Q. (Wechsler Adult Intelligence Scale) of 135. This places him in the 99th national percentile, which means that 99% of the general population would get a lower score when similarly tested and 1% would get a higher score. Further, they offer their expert opinion that the defendant’s hospitalization has ‘ ‘ changed [him] in many ways as a result of his extended hospitalization and imprisonment, so that the process of relaxing some of his narrowness is already taking place that he has “ matured ” in this interim period (testimony of Dr. Vasey); that his “ rigidity and [his] exaggerated sense of responsibility does not present the same severe burden that it did at the time of initial incarceration ’ ’; that during his hospitalization 1 ‘ he has been quite cooperative, friendly and sociable ” and that he “ is oriented fully to time, place and person ”.
The psychiatrists are equally helpful in reporting to the court the defendant’s less favorable mental and social characteristics. Despite the favorable conclusion that the defendant ‘ ‘ is without psychosis at the present time ” and that “ he is not dangerous either to himself or to the community ”, the testimony of the psychiatrists and their reports agree that, “ he has a character ¿logical or personality disorder, which can best be described *218 by indicating that he is constricted in his view of the world and himself and that this may have continued effect on his functioning to the point of requiring psychiatric treatment ”. (Emphasis supplied.) Indeed, there is a clear thread of “ personality disorder ”, and/or, “ severe neurotic problem” running through all testimony and all reports. It colors both the diagnosis of mental status, and to .some extent the behavioral prognosis. Candidly, it is this area of analysis that is most disturbing to the court, particularly when viewed in the context of making a determination as to whether or not the defendant may safely return to the community. For example, the two court-appointed psychiatrists say, “It is our recommendation, therefore that he be urged to apply for and receive psychotherapy as an out-patient, when, or if he is discharged.” In this same vein, the psychologist reported to the court, “he is free of any psychotic symptoms at this time. However, he has a rather severe neurotic problem primarily in the area of excessive constriction, repression and feelings of rejection. From a legal pomit of view he is free of mental impairment, but could use considerable help in re-adjusting to life outside of institutions.” (Emphasis supplied.) Thus, the reports and the testimony, sometimes directly, sometimes indirectly, signal the depth and intricacy of the prime question, i.e., “ the risk to society should the defendant be released.” Typical of such “ signals ” is the following abstract from the Marcy Hospital summary dated May 19, 1969:
‘ ‘ During his hospitalization, this young white male patient has been quite cooperative, friendly and sociable. He hasn’t manifested any overt psychosis. However, he has shown shallow affect all through. At times, he seems to be somewhat preoccupied and distant. For the most part, he has been pleasant, thoughtful and trustworthy. He shows little discomfort or anxiety in discussing the tragedy and the events leading him to here. He hasn’t expressed any suicidal or homicidal ideas. He expresses no guilt on account of his actions but feels remorse and sympathetic towards the family of the girl. He still has only superficial insight and his judgment seems to be somewhat impaired.” (Emphasis supplied).
Again, typical of what this court has referred to as the “ signals ” of doubt and risk running through the testimony and reports concerning the applicant, are the following excerpts from the testimony of Dr. C. A. Del Cioppo (direct examination):
“ Q. Would you describe to us, please, the examination that was made by you on that date? A. First of all, through the *219 methodology of the usual mental status examination, I found him to be without any brain injury or brain disease; a common examination, there also might be a brain tumor or encephalitis. I saw no mental signs of an organic illness. Throughout the course of the conversation he was spontaneous. He answered questions relevantly. He showed usual logic in his answers. He showed no unusual anxiety or affective tone. Through the course of the lengthy, mental status which lasted almost 3 hours, I found Mr. Corrente to be a young man who has a great deal of aggressiveness to him and some underlying hostility in his feeling tone about issues in general, about himself, what-have-you. He handles these feelings of aggressiveness and impulses, I found, by employing what is referred to as obsessive, compulsive techniques. He is dedicated to schedules. He is dedicated to being in control of himself, very dedicated to being in control of a situation; and this is how he handles some of his more intense impulses. I at no time found him to have poor reality testing. I didn’t find him to interpret in his way of thinking issues, situations, and the world around him in an unusual way. In short, at the time, I found him to be not psychotic.” (Emphasis supplied.)
Again, we read (direct examination):
“ Q. While we are on that subject, would you tell us what Doctor Cranston’s finding was as a result of that test? (Referring to the Rorschach Test.) A. The Rorschach Test shows a lack [of] psychosis. However, his personality is severely constricted with a strong tendency to be negativistic in a passive, resistive way. He shows a lack of responsiveness both internally and externally. He is overly intelleetualized. He has very strong feelings of rejection. The feeling of not being loved is repressed and hence primarily unconscious to him. He has reacted to these feelings by trying to deny his needs for love and affection. This has lead to him being quite sensitive to others’ need for love and affection. He lacks social skills and finds it difficult to relate emotionally to others(Emphasis supplied.)
Upon cross-examination the following colloquy is significant:
“ Q. Doctor, a short time ago you were asked by Mr. Shannahan a two-part question and I believe that you replied to the first part, but not the second part. He asked you if Mr. Corrente was suffering any psychosis or mental disease. I believe that would be the shortened version of it; and the answer, he was suffering no psychosis. Would you have a diagnosis of bim at the present time as suffering any mental illness? A. Yes. As I stated previously, I view Mr. Corrente as an *220 obsessive, compulsive young man, a psychiatric diagnosis; hut it is a neurosis. (Emphasis supplied.)
“ Q. And this is a recognised mental illness and you feel it continues to the present time. Is that correct? A. Yes. (Emphasis supplied.) ”
Again, upon cross-examination, we read:
“ Q. If Mr. Corrente were released and began to enter active society again and again pressures were brought upon him, is it not a possibility more than remote that the same type of explosive situation and schisophrewia could reoccur? A. This is what led us to strongly recommend continued psychiatric care. This would minimise -as much as is medically possible that possibility.
“ Q. In other words, to prevent that type of thing happening again, there would have to be a close control by a private psychiatrist. A. There would have to be a very close relationship, right.
“ Q. Which would .result in a control on him beyond himself. Is that correct? A. That is right.” (Emphasis supplied.)
Finally, Doctor Del Cioppo testified as follows:
“ The Court: Would you agree with Mr. Cranston that his neurotic problem, particularly including the feeling of rejection, and I assume also his obsessive compulsiveness, remains severe?
“ The Witness: Yes, I agree with that.
‘ The Court: Currently, would you have an opinion as to his insight?
“ The Witness: Yes. I think he has the beginnings of insight to how he came to be the way he is now, the beginnings of it, rudimentary, embryonic.
“ The Court: Boom for improvement?
“ The Witness: Considerable.”
From the foregoing, this court is inexorably drawn to the conclusion that, while the defendant suffers from no present psychosis, nevertheless, he suffers from a severe neurosis (obsessive compulsiveness) which may, under stress, trigger impulsive, unexpected, and perhaps violent reaction. He is mentally ill. From the history of the subject and the current diagnosis it is not unreasonable to conclude that this severe neurosis may well have been the underlying catalyst of the schizophrenic episode that cost the life of his friend in 1966. The diagnosis of these learned physicians concerning the defendant’s present “ severe neurosis” is something more than a mere guess concerning the defendant’s future conduct. It is an opinion given with that degree of reasonable medical certainty upon which this court may rely and act accordingly. Left in the realm of the *221 “educated guess ” this court is reluctant 'to act. Quite the opposite is true when the opinions of the experts are generated by a “ reasonable degree of medical certainty. ’ ’
Thus, it would seem to this court that before an appropriate disposition may be made in any case such as this, there are three major questions to be asked: (1) Is the patient dangerous, i.e., how likely is he to commit the same or another criminal act again; (2) Is he deferrable, i.e., despite any mental illness, is his present motivation such that anticipation of consequences can decisively influence his behavior; and (3) Is he treatable by medical or educational methods'? From the record of the instant case this court is compelled to conclude that the answers to the first two questions remain unknown, or are, at best, an educated guess. All seem to be agreed that the third may be answered in the affirmative.
With .regard to the question of treatment, it is interesting to note that one of the psychiatrists volunteered the information that, to his knowledge, the Department of Mental Hygiene, at the present time, has no viable program of analytical psychiatric therapy. It is encouraging to observe that this patient has responded as well as he has to the department’s programs in group therapy, occupational therapy, recreational therapy, and to whatever medication has been prescribed.
Counsel for the patient has commendably assured the court, that should the patient be released from hospital custody, continuous psychiatric counseling and therapy would be welcomed by the patient as a condition to be imposed upon his release. While the Code of Criminal Procedure ('§ 454, subd. [3]) contemplates “ release on such conditions as the court determines to be necessary ”, there is, as a practical matter, no way for the court to retain control of or supervise such a program. Unfortunately, the statute makes no provision for placing a patient similarly situated under probation or parole supervision. Should defendant be released and should his mental status deteriorate, the court would have no way of learning of any such change. Without supervision, no one would have control over this man.
From a painstaking and exhaustive review of all the evidence, this court conceives that the subject will benefit from continued psychiatric treatment since he has already shown improvement. Hopefully, such treatment will include something more than occupational and group therapy. In the light of his progress to date it is reasonable to speculate that his continued maturation will improve his insight and judgment, subdue his compulsiveness, and thereby lend positive weight to a determination *222 of any future application for his release from patient status. It would be very helpful if, in the future, the Legislature might study the ‘1 release ’ ’ provisions of the code and perhaps provide for out-patient care, or a type of probationary supervision, that would not only assure his adjustment to the community, but he practical enough to lend him meaningful rehabilitative assistance.
The court is indebted to all counsel and all physicians for their intelligent and even-handed assistance in these proceedings. All have conducted themselves in the highest and best traditions of their professions.
The application for release of the patient is denied.