David 0. Boehm, J.
This is an application brought pursuant to OPL 330.20 to discharge Bruce Arnold Sherman from the Rochester State Hospital, a civil institution of the State Department of Mental Hygiene, where he is presently confined after being acquitted by reason of insanity of the charge of murdering his wife in the afternoon of December 1,1971 by shooting her five times with a .30-06 calibre rifle in the driveway of her house on Crimson Bramble Road in the Town of Henrietta, New York.
Sherman was tried before me, without a jury, on May 18 and 19, 1972. He was represented by retained counsel. The same counsel now appears for him in this proceeding.
Sherman and his wife had been separated for some time. On the day of the shooting, he had driven to Crimson Bramble Road and waited in his car until she returned home from work at *691 5 o’clock and shot her as she got out of' her car to enter the house. She died almost immediately. Thfe defendant’s 11-year-old daughter was home from school beO&lise of illness. Hearing the shots, she looked out of the living room window and saw her father’s car drive away.
Several hours later, there was a complaint that someone was shooting from a car into the trailer home of defendant’s parents on Walworth Road in Hunda. They were both home. His mother called the Sheriff. Upon arrival, the police first observed defendant in his ear about 300 yards away from the house and he ultimately was taken into custody. Found in his automobile were the following items: 60 to 70 live rounds of .30-06 calibre cartridges; 40 to 50 live rounds of .243 calibre cartridges: one semiautomatic .30-06 Remington rifle; one bolt action .243 calibre Remington rifle with telescopic sights; 30 to 40 spent cartridges of both calibres; a half-consumed quart of liquor.
Dr. Wellington Reynolds and Dr. David J. Barry, court-appointed psychiatrists, found the defendant competent to stand trial and this finding was not contested.
The defendant pled not guilty by reason of insanity. At his trial Dr. William Libertson testified as a witness for the prosecution and Dr. Benjamin Pollock testified for the defense. Both medical witnesses gave it as their opinion that on December 1, 1971, when the defendant killed his wife, he lacked substantial capacity to know or appreciate either the nature and consequences of his conduct or that such conduct was wrong by reason of mental disease. There was no medical evidence to the contrary.
Although, as trier of the facts, I would ordinarily have found the guilt of the defendant proven beyond a reasonable doubt, I was compelled, because of the uncontroverted medical testimony, to deliver a verdict of acquittal by reason of insanity. (Penal Law, § 30.05; People v. Lee, 29 A D 2d 837; People v. Slaughter, 34 A D 2d 50.) I then, also as required by law, ordered that the defendant be delivered into the custody of the Commissioner of Mental Hygiene (CPL 330.20) and this was duly done on May 19, 1972.
Less than three months later, by letter dated August 10, 1972, the Commissioner of Mental Hygiene requested that proceedings be initiated, pursuant to CPL 330.20, to release the defendant. This was based upon the recommendation of the Rochester State Hospital’s Special Release Committee, consisting of Dr. Daniel Davis, Dr. Ursula Arnsdorff and Dr. Joseph Tymochko, who found after a meeting on July 14, 1972, that the defendant *692 showed ‘ ‘ no evidence of being mentally ill or in need of continued hospital care.”
I thereupon requested the Monroe County Mental Health Clinic to arrange for independent examinations of the defendant by two qualified psychiatrists and Dr. David J. Barry and Dr. Wellington W. Reynolds were appointed for this purpose by the County Director of Mental Health Services.
Dr. Reynolds examined the defendant September 7, 1972 and Dr. Barry examined him September 13, 1972. Both found “ no evidence ” of mental disorder. Dr. Barry’s report stated that the defendant ‘ ‘ could be discharged without danger to himself or to others.” Dr. Reynolds’ report found ‘‘no evidence of potential hostility or dangerousness * * * He [defendant] is presently without psychosis and seems likely to continue his present recovery.”
I then directed that a hearing covering the issue of dangerousness be scheduled and this was done on October 2,1972. At this first hearing Dr. Reynolds, Dr. Barry, Dr. Arnsdorff and Dr. Tymochko testified.
The issue to be decided was whether or not Sherman, if released, would be a danger to himself or to others (CPL 330.20). Although entitled to a jury (People v. Lally, 19 N Y 2d 27), counsel for Sherman did not request one, and the hearing proceeded before me without a jury.
Parenthetically, it might also be noted that the holdings in People v. Haynes (30 A D 2d 705) and Matter of Roberts v. County Ct. of Wyoming County (39 A D 2d 246), regarding disqualification, do not seem to apply where the issue involved at the trial was insanity at the time of the commission of the criminal offense, as here, rather than competency to stand trial, as in those cases. Accordingly, I did not disqualify myself from hearing this proceeding.
According to the testimony of Dr. Reynolds, Sherman indicated no hostility towards his father, who had shot petitioner in 1970, or towards his dead wife, and showed appropriate remorse. In Dr. Reynolds’ opinion Sherman was without psychosis and, if released, would not be a menace to society nor would he represent a danger to himself or others. However, Dr. Reynolds admitted that he had spoken to neither Dr. Libertson nor to Dr. Pollock nor had he made himself familiar with their findings and conceded that he did not have an adequate history. He pointed out that his opinion was based solely upon the absence of mental sickness and confessed that he had minimal experience in matters of criminal responsibility. Dr. Reyn *693 olds recommended that, if Sherman is released, the stresses which were the original cause of his anxiety be proscribed and that contacts with those people who gave rise to his emotional condition at the time of the shooting be eliminated.
Dr. Arnsdorff testified that the Special Release Committee of the Rochester State Hospital met on July 14,1972 for one and one-half hours. Sherman was at the meeting for about a half hour and interviewed. The committee members found no evidence of mental illness at the time of his examination. They were aware of his prior diagnosis of psychosis and of his prior suicide attempt, but did not have details of the attempted suicide and erroneously assumed that it had taken place in the jail after the petitioner had shot his wife. Dr. Arnsdorff testified that the report of the clinical psychiatrist at the hospital described Sherman as an “ explosive personality ”, that is a “ personality disorder involving a low-level of tolerance to stress situations.”
It was Dr. Arnsdorff’s opinion that Sherman is no longer in need of hospitalization in a mental hospital and that he would not be a danger to himself or to others if released, provided he kept away from certain persons and stress situations. She recommended that if released, Sherman stay away from alcohol and from his father and that he receive training for some occupational skill.
However, upon further examination Dr. Arnsdorff disclosed that Sherman had a history of “ transient psychosis ” and was unable to give an opinion as to the probability of recurrence of another such episode or the probability of his attempting suicide again.
Dr. Barry testified that he had seen Sherman on two occasions, once in April of 1972 with respect to the question of capacity to stand trial and, thereafter, on September 13, 1972 in connection with the issues involved in this proceeding. He obtained a history from Sherman at the time of the April examination and a further history at the time of the September examination. He had also reviewed Sherman’s State Hospital records.
Dr. Barry found Sherman to be without any sign of mental disorder and not then suffering from a mental disorder. Dr. Barry testified that he knew of the diagnosis that had been made that Sherman was suffering from mental illness in December, 1971. Dr. Barry also knew Sherman’s father had shot him and that Sherman had thereby become a paraplegic. He was also aware of Sherman’s attempted suicide. Dr. Barry admitted he was unable to predict what was likely to occur in the future if Sherman were released, but testified he found no then hos *694 tility on Sherman’s part against his father and no likelihood of hostile action by Sherman against his father in the near future. Sherman’s future, however, would be affected by possible alcohol abuse and would depend upon a change in his social milieu in order to eliminate the circumstances causing Sherman’s prior emotional strain, particularly since he was still fearful of his father.
Dr. Barry recommended that if Sherman were released, his behavior be monitored by limitation of alcoholic consumption and the requirement that he regularly report to or meet with someone familiar with his past history and with a knowledge of what to be on the look out for. It was Dr. Barry’s opinion that, subject to these conditions, Sherman could be released without danger to himself or to the community. However, Dr. Barry agreed that Sherman suffered from an explosive personality disorder and that his opinion regarding Sherman’s conduct was “ a near-term opinion” only. There is no guarantee, Dr. Barry pointed out, that Sherman’s rancor against his father or another might not erupt again in a few months, or years, especially if he started abusing alcohol again.
Dr. Tymochko, as a member of the State Hospital Special Release Committee, examined Sherman on July 14, 1972, at which time Sherman did not display any acute mental illness, nor was he then psychotic. Dr. Tymochko was familiar with Sherman’s history from having reviewed the State Hospital records and with the evaluation in these records made by Dr. Davis on June 1,1972, describing Sherman as “ basically very hostile, aggressive person * * * with poor controls and unable to tolerate any great degree of1 frustration. At times his hostile impulses overwhelm him and at such times he is driven to act out his anger by physical assault. ’ ’
Dr. Tymochko recommended that if Sherman were released, he be kept under strict control and pointed out that if Sherman did not listen to his advisors when released, or did not live under the controls imposed, he could decompensate; someone, therefore, had to be made responsible for him.
At the conclusion of this first hearing, I requested that a proposed program be furnished by the Rochester State Hospital regarding the supervision of Sherman if released, as required by law.
Subdivision 3 of CPL 330.20 provides, in part: “After * * * a hearing, the committed person must be discharged, •released on such conditions as the court determines to be necessary, or recommitted to the commissioner of mental hygiene. *695 The commissioner of mental hygiene must make suitable provision for the care and supervision by the department of mental hygiene of persons released conditionally under this section.”
I also requested the County Probation Department to conduct an investigation and prepare a report incorporating its recommendations and proposals regarding release and supervision.
Further proceedings were adjourned until the Department of Mental Hygiene had furnished the requested information and the report of the Probation Department had been received.
Thereafter, a letter, dated October 30,1972, was received from Dr. Bussell Barton, Director of the Bochester State Hospital. The following excerpt from it presented a surprising, even alarming, picture of the service available at one of the institutions of the department upon which the Legislature had placed the responsibility for persons like Sherman when released. “We are aware that in the hearing of the third of October, 1972, some ‘ safeguards ’ were suggested like precautions to keep the patient from drinking and also close supervision. This kind of service is, in a realistic way, quite beyond what the hospital can offer to any outpatient. Most probably this type of supervision can be given through a parole officer that you may appoint from your office.
“ Certainly this man is not psychotic. He knows quite well what he is doing and is quite capable of making his own decisions. At this time, because of lack of motivation, he refuses all the help that the hospital can offer him. As you may understand, we are not in the position to force Mr. Sherman into any of the programs, because it is our experience that when a patient does not want any of the services, he actually can sabotage any program that is offered.”
Thereafter, Dr. Barton on November 8, 1972, wrote again. Apparently, Sherman had been interviewed again and, according to Dr. Barton’s letter, agreed to accept a proposed plan, as follows:
“1. The patient will attend the Out Patient Dept, at the Bochester State Hospital once every two weeks and will be seen by the attending psychiatrist. I do not think this will be therapeutic.
" 2. The patient will attend the Behabilitation Dept, at Strong Memorial Hospital which if successful the patient will be able to walk with braces and crutches instead of being confined to a wheelchair.
“3. The patient will attend the Monroe Community College to the drafting course, that will take a total of about two years *696 to complete. This course will allow the patient to become selff sufficient and independent from welfare.
“ 4. The patient accepted to go on antibuse treatment to control his drinking. There is no assurance that the patient will take the antibuse on his own and the brother with whom the patient will live should be the person to supervise this by being sure that the patient takes the medication everyday.
“ 5. The transportation from home to the hospitals and the college will be provided by OVR.
“ The program as presented above is the best that we can provide but again there is no assurance that the patient will cooperate all the way in the follow up and rehabilitation endeavors because in the future if the patient decides not to go through with this program we are not in the position of forcing him into following the plans and probably as we did suggest in the past you could appoint a probation officer that would visit and counsel the patient on a regular basis. ’ ’
Thus, here again, the .State Hospital was, in effect, candidly admitting that it had no enforceable release program to offer Sherman or the community.
On November 9, 1972 another hearing was held before me, at which time there was testimony from Dr. Barton, Dr. John B. Wright, Assistant Commissioner, New York State Department of Mental Hygiene and Dr. Daniel Davis, Deputy Director of the Rochester State Hospital and a member of the hospitales Special Release Committee.
■ In his testimony, Dr. Barton stressed that in Sherman we are not dealing with an intelligence disorder, but rather with a character disorder, a moral defect, which is not to be equated with madness. Sherman has, Dr Barton said, a “ psychopathic disorder of sentiment and values and controls at times.”
Although describing Sherman as a psychopath or sociopath, Dr. Barton emphasized that he is neither psychotic now nor was he psychotic when he shot his wife. This latter opinion represents a clear departure from the medical testimony at the trial. It is unfortunate that I did not then have the benefit of Dr. Barton’s testimony or that of the other Rochester State Hospital physicians who testified in agreement with him. The result might very well have been different and the Department of Mental Hygiene would not now be burdened with someone it feels it cannot help and does not want.
Because of the importance of Dr. Barton’s testimony, I have set forth at length significant portions of it: i
*697 “ A. Well, my belief is that Mr. Sherman is not psychotic. My belief is that he is a certain danger to the public, if released, not to the public in general but perhaps to people in whom he has a certain relationship. My belief is that this risk to others is greater than one would find from the ordinary reasonable man in the street, the substantial majority of the people, but because there is an increase of the risk to others, it is not necessarily stated with such certainty on my part that he should therefore be detained or we should keep him at Rochester State Hospital. The risk of a person committing an act like this is present in all persons when provoked sufficiently under certain circumstances, as far as we know. We are led to believe that there are people who are of such a stature in their personality that they wouldn’t commit such a crime, regardless of provocation but it is generally thought that under certain provocation people would behave in this manner and all I can say about Mr. Sherman is that from my discussions with Dr. Davis and Dr. Linares and from my knowledge of other patients who have had such illnesses and from the world literature, he is a greater risk to certain other people than the average person.
(By Mr. Presutti) Q. How would you go about, Doctor, medically, professionally, clinically, if you had to decide, how would you confine or restrict these possibility risks to certain people, assuming that he was released?
A. I don’t think there is any way of so doing because the more contact an individual has with a psychiatric population and psychiatrists, the greater an expert he becomes in giving the right answers. 'So, the psychiatrist can easily be misled and, therefore, the greater possibility that if he has some objective in mind he will cany it out regardless of the restrictions we put on him or the surveillance that we try to carry out. If you ask me what would I recommend, I would feel that whatever we do will be ineffective.
Q. So, what would be your medical conclusion then?
A. Well, I can only question the initial decision that there was insanity present and continuing for his action. * * *
Q. Then, he is not psychotic?
A. Hot psychotic.
Q. He is not a danger to himself?
A. Ho more than most members —
Q. You and I?
A. You and I.
Q. The lady at your left?
A. Well —
Q. Given sufficient provocation, as you put it?
A. You really are asking me to judge the lady without knowing anything about her.
Q. Well, exclude her, but assuming that she is within the normal sixty-six percent, the lady on the left. How about dangers to others?
A. I think there is an increased danger to others.
Q. Isn’t that the usual, norm in any person who has been afflicted with some sort of a mental disease?
A. Ho, no, not necessarily.
Q. It isn’t so?
A. Ho, this doesn’t follow at all. Some people with mental disease indeed are so humble and so meek that they are not a danger to anyone.
Q. And would it be to anyone in particular or just a few? I thought I heard you say to some people.
A. Well, I think that the fact that there has been sort of hostility expressed and so forth in the past that it is prudent to think there will be an increased *698 danger generally to people that cross this man, but particularly to those involved in this emotion situation.
Q. Well, namely his father?
A. Yes.
Q. Correct?
A. Or other father figures; that is, other people who have a postión of authority. * * *
Q. Now, feel free to refresh your recollection from that letter or any other document that might give you some medical assistance to tell this Court today what recommendations your department would have or would make to provide suitable provision for the care and supervision by your department of Mr. Bruce Sherman, should he be released conditionally under Section 330.20 of the Criminal Procedure Law of the State of New York?
A. Well, I have a problem because the objective word is suitable and what I shall say hinges on what is to decide what is suitable, but the first paragraph was that the patient should attend an out patient department of the Rochester State Hospital once every two weeks and would be seen by the attending psychiatrist ; .that I don’t believe that this will be therapeutic.
Q. What is therapeutic, what does it mean?
A. It means a course of action or discussion which tends towards alleviating some abnormal condition or situation) mental or physical.
Q. Wouldn’t be of any help?
A. It wouldn’t in my view alter the personality of Mr. Sherman.
THE COURT: The personality, Doctor?
THE WITNESS: Yes, the personality. This is psychopathic disorder of sentiment and values and control of aggressive actions at times.
THE COURT: You say it is psychopathic?
THE WITNESS: I think it is psychopathic in the sense that I use the word of failure to a person who is persistently irresponsible or and aggressive.
THE COURT: Are you familiar with the term sociopath?
THE WITNESS: I am using this in the same term, who doesn’t obey the customs and mores of the society into which he is born but we all disobey them in mild areas and this wouldn’t constitute abnormality. In fact, anybody who abides by all of them might be said to be abnormal and he would be obsessional and when a person disobeys the customs and mores to an extent or that it harms or seriously discomforts others and this man’s persistent or when he is persistently irresponsible in his behavior and then I would say that he is soeiopathic or psychopathic.
THE COURT: Would you call, in your opinion, is Bruce Sherman a sociopath?
THE WITNESS: Yes, a sociopath from what I have heard.
THE COURT: Thank you.”
MR. PRESUTTI CONTINUING-:
“ Q. Does that make him a menace to society?
A. You see, your question really asks me so much because you might say that all people are a menace to society. It’s a question of degree. He is a greater degree.”
Dr. Barton recommended the following program for Sherman to follow if released: (1) he take antibnse in order to curb Ms alcoholic consumption; (2) he attend the rehabilitation department at Strong Memorial Hospital to get walking with braces and crutches instead of being confined to a wheelchair; (3) he *699 attend Monroe Community College to the drafting course because that can be done in a sitting position; (4) he attend the outpatient department at Rochester State Hospital.
But again, Dr. Barton emphasized that even if Sherman complied with these conditions, he might be less of a menace than •he is at present but would still be “ more of a menace than the average normal man. ’ ’ Even the threat of possible incarceration if he violated the conditions of release would not, in Dr. Barton’s opinion, operate as a long-term deterrent.
“ Q. * * * Wouldn’t the threat of being incarcerated or revoking probation be quite an aid in having him comply with the restrictions ?
A. [Dr. Barton] I think it would act as a deterrent.
Q. You would also recommend that then to help?
A. Well, I simply don’t know the legal situation. I feel that you are asking me questions about someone who is sane at the time he committed an offense who is unlikely to carry out any undertakings that he gives us. I mean, he will carry them out for a month or so, but not indefinitely.
Q. Now, Doctor, I know you probably don’t want to name people and I am not going to name them, but you refer to on several occasions that if Mr. Sherman was released on certain conditions that there is a greater risk for example, if he talked to his father than if he talked to me or someone else. Now, could you and be frank with us, name anyone other than his father then you feel he shouldn’t you said something about fatherly —
THE COURT: Father figure.
MR. PRESU'TTI: Fatherly authority.
THE COURT: Father figure.”
MR. PRESUTTI CONTINUING:
“ Q. Could you name anyone else? Don’t think you have to give me an answer if you don’t know of any.
A. I would like to give you an answer but I don’t know of anybody, but the situation might arise when somebody was trying to persuade Mr. Sherman to a course of conduct that he didn’t like or when he was crossed in certain situations, especially had he been drinking, then he would be disappropriately greater danger to that person than you or I.”
It is quite clear from the medical testimony that there is essentially only one reason for urging Sherman’s discharge from the Rochester State Hospital, because he is not mentally ill. The thrust of all of the medical opinion is that, because Sherman is not mentally ill, he therefore cannot be treated; therefore there is nothing the hospital can do for him; therefore he should he released. This position, to sum it up, is that a State hospital’s primary purpose is to care for mentally ill people and someone like Sherman, who is not mentally ill, does not belong in a mental institution.
This may be a perfectly valid argument from a medical point of view but, under the law, the Rochester .State Hospital, as an institution of1 the Department of Mental Hygiene, is obliged to retain custody of someone like Sherman if he may be a danger *700 to himself or to others. Such may be unfortunate in the light of the therapeutic orientation .of the Department of Mental Hygiene, but both the department and the court are confronted with the inescapable existence of GPL 530.20 and any change in it would have to be made by the Legislature.
Further, because of the circularity of the reasoning involved, pursuit of this position, from the law’s point of view, would, in all respect, appear to be illusive as well as elusive and would take us far afield in a hare and hound chase of psychiatric nomenclature. Thus, what if a psychiatrist were to designate a sociopath or psychopath, or a person with an ‘ ‘ explosive personality ’ ’ 'or with a “personality disorder” or someone who suffered episodes of “transient psychosis” as mentally ill? Would there then be room at the inn for Sherman? Does not the process then become one of labeling rather than of treatment?
Is this unfair or farfetched? Hardly. Dershowitz tells us of an episode in which .the staff of a large mental hospital took a vote to determine whether a sociopathic personality should be regarded as a mental disease. (Dershowitz, Psychiatry in the Legal Process: A Knife that Cuts Both Ways, Harvard Univ. Law School Sesquicentennial Address, Sept. 22, 1967).
And a textbook offers the following: ‘ ‘ The psychiatrist is a medical man who has specialized in the study and the treatment of mental disorders or, as it is more and more coming to be phrased, personality disorders.” (Overholser and Richmond, Handbook of Psychiatry, p. 5, J. B. Lippincott Co., 1947). (Emphasis supplied.)
Dr. Philip Q. Roche, writing on criminal responsibility, says: “ It leaves the law hardly touching a larger segment of persons afflicted with conditions medically recognized as disabling, namely, those suffering from anxiety states, hysteria, depressions, compulsive disorders ranging to psychotic degree, and a group variously described as psychopathic personalities.” (Hoch & Zubin, Psychiatry and the Law [Gruñe & Stratton, 1955], p. 112). (Emphasis supplied.)
In this connection, it is also approprite to recall that Durham, whose prosecution resulted in the creation of a new legal standard for determining criminal responsibility, was described as a “psychopathic personality ”, either alone or with psychosis. (Durham v. United States, 214 F. 2d 862 [1954].)
This is not to indicate a lack of sympathy or understanding of the difficulties confronting Dr. Barton or his understaffed and underfunded hospital. I fully appreciate his difficulty and the dilemma confronting him in matters of this kind. Thus, when *701 asked if the hospital would provide the service required by CPL 330.20, he responded :
THE WITNESS: Yes, of course we will try and we are there to serve and I can’t answer for conditions that haven’t been asked of me and surveillance and services are seriously hampered by the staff shortages and by our shortages not only of staff but of skilled staff, but we will do our best.
MR. PRESUTTI: You are willing to, should the court go along on this application to offer your facilities and offer everything you have to help implement not only your recommendations but offer the recommendations the Court may see fit to impose?
THE WITNESS: Well, I say, referring —
MR. PRESUTTI: Within reason. I don’t mean they will have a special room for him but with the facilities that you are not using.
THE WITNESS: And in competition with the other demands made of us, yes, but there are many other demands and we would like to do far more for each of our patients but it must be expected that it is not humanly possible to do everything when the demand is so great and the staff is so few.
However, this court is also confronted with the limited alternatives furnished to it by the Legislature and must act accordingly.
At the same second hearing, Dr. Wright and Dr. Davis added little of an independent nature. Both concurred with the views of Dr. Barton. Doctor Davis testified that Sherman could be released without danger to himself and to others within the reasonable future but this opinion is difficult to accept on face value in the light of the confirmation by him of his July 1, 1972 evaluation of Sherman as a “very hostile, aggressive person * * * with poor controls and unable to tolerate any great degree of frustration. At times his hostile impulses overwhelm him and at such times he is driven to act out his anger by physical assault.”
In deliberating over the bizarre and cruel sequence of events which brought these issues' before me, I find myself1 returning to a small mobile home situated on a few acres -of land in the Town of Walworth in the County of Livingston. There, in the darkness of early qvening on the first day of December, 1971, three sudden shots come out of the night and tear through the garage. Two people inside the home, a man and a woman, look outside and the woman sees her son’s car on a nearby hill. Frightened, she telephones the Sheriff’s office and lies prostrate on the floor until help comes.
What thoughts went through her mind during this ordeal, and what thoughts afterwards when she learned that the shooter was her own son?
What thoughts tumbled through a startled young girl’s mind when she saw her father’s car drive away and then learned that her mother had been killed by five bullets shot from a high- *702 powered hunting rifle in that same car ? What were her thoughts when it was confirmed that it was her own father who was the killer?
And what considerations must be taken by this court, to whom the community has delegated the awful power of making the decision whether or not to release a man who is, by the medical evidence, a “ psychopath ” or “ sociopath ” with a “ personality disorder involving a low-level tolerance to stress situations ”, who is a greater danger to some members of society than the average man, who suffers from episodes of “ transient psychosis ”, who is “ persistently irresponsible in his behavior ”?
Does this court have the right to gamble with the life of Sherman’s father or anyone else whom Sherman might view in the same distorted light in a suddenly explosive moment? And if the future conduct of an individual represents, at best, a calculated gamble, should not the predictable risks be reduced to such a minimum that there is as close to zero probability of their occurring as can reasonably be achieved? Since this is a civil proceeding, may not the foreseeable ambit of risk rule, historically applied in the law of torts which also deals with life and limb, be applied here as well?
This court remembers all too well when it was confronted with a similar situation in 1970. At that time it was obliged to release from imprisonment a sex deviate who had 14 years earlier been given a one day to life sentence of imprisonment for raping a five-year-old girl. The basis for the release was the opinion of two psychiatrists given at a hearing required to be held to determine whether the prisoner was a danger to society or was capable of being benefited by confinement, in accordance with People v. Bailey (21 N Y 2d 588, 594). It was upon the examination and report back in 1955 of two other psychiatrists that the prisoner received his original indeterminate sentence. These same psychiatrists had given their opinion at a later hearing that, although the prisoner was not psychotic and was not a danger to society, he might molest children if he drank alcohol, At the hearing held before me, two other psychiatrists testified and rendered opinions that the prisoner’s release would not constitute a danger to society and that he would not benefit from further confinement in prison. Neither psychiatrist found the prisoner to be suffering from psychosis. One of the psychiatrists admitted on cross-examination that the prisoner would be more likely to commit a sex offense than the general alcoholic population.
*703 This hearing was held on or about February 4,1970. The prisoner was released. On March 31, 1970, less than two months later, this man was arrested on charges of first degree sodomy, first degree sexual abuse and second degree burglary as a result of his entry at 3:00 a.m. that morning into an apartment and sexually assaulting a five-year-old boy. That man was convicted, upon a plea of guilty of sexual abuse, first degree, and is now back in prison serving a sentence of 2% to 7 years maximum. But in the meantime he had soiled the life of another young victim.
If the science of psychiatry may, along with other sciences, properly depend upon empirical data, then may not this court also appropriately apply its own experience in similar cases, such as the one just referred to? In addition, may it not on the basis of plain common sense and in the absence of any more specific tools employ the past as one of the factors of predictability?
In attempting to predict what someone will do, it is reasonable to be guided by what he has done. I recognize that there are arguable exceptions to this rule, St. Francis and Buddha being among the better known ones, but their early lives had been frivolous, not assaultive. On the other hand, what do we see when we examine Sherman’s past?
We find in Sherman a man with a stormy, delinquent past (see Addendum) who had been shot in April, 1970 by his own father. Trying to kill his son, the father had made him a paraplegic, confined for the rest of his life to a wheelchair. In the fall of the same year Sherman attempted suicide and came so close to success that he was unconscious for three days. After regaining consciousness, he told his brother that he tried to commit suicide because he did not want to live the rest of his life in a wheelchair.
Thereafter Sherman became moody and withdrawn, living in dread fear of his father. He stayed indoors most of the time, with a loaded gun, the front door locked, his bedroom barred and the shades drawn. Sherman’s mother would visit him without the knowledge of his father, who hated him with such an intensity of passion that he would shake and act “ like a madman ” when discussing his son. On several occasions he said to Sherman’s brother, “ I wish that son-of-a-bitch was dead! ” and would get ‘ ‘ violent ’ ’ with the brother for living with Sherman.
As time went by, Sherman’s moodiness increased, he became strangely quiet and so nervous that he would shake. More and more of his days were spent closeted in his bedroom.
*704 On December 1, 1971, the day Sherman shot his wife, Dr. Libertson testified at the trial, he was “ out of contact with reality * * * much of his behavior was random and confused.”
Dr. Pollock, the defense psychiatrist, testified that Sherman had been drinking that day and was suffering from blackouts. He remembered being in the vicinity of his wife’s house and then it appeared as if someone else had pulled the trigger. He next remembered being miles away, in a field, wanting to kill his father and then shoot himself, blacking out from time to time.
Sherman’s attitude toward his father and wife, «aid Dr. Pollock, was a pure paranoiac reaction. This was also indicated by keeping himself barricaded in, carrying a loaded gun to protect himself from his father and wanting to kill him. Indeed, Dr. Pollock testified, Sherman was sick to a very marked degree.
Dr. Pollock examined Sherman in the jail on December 31, 1971. He told Dr. Pollock that he had been having blackouts for the past 3 to 4 years which lasted about 15 minutes, and that he had been drinking heavily.

He also said that if he could get out he would spend all of his time trying to hill his father, and then himself.

It is of strong and persuasive significance that Dr. Pollock, Sherman’s own medical witness, testified that as of the day of the examination, Sherman was both a danger to himself and to society because of his paranoia. One wonders what has happened to his paranoia; what to his dangerousness?
There is no question but that all of the doctors who testified in this proceeding are linking, and also limiting, psychosis, or mental illness, with dangerousness. However, as another psychiatrist points out, such an argument is not very compelling. (Dr. Bernard Rubin, Prediction of Dangerousness in Mentally 111 Criminals, 27 Arch. Gen. Psyehiat. 397, 398 [Sept. 1972].)
The same Dr. Rubin makes a very telling observation: “ Part of the problem may be that psychiatrists use mental disease as a concept which relates to treatment * * * and labelling of deviancy as mental illness or predicting dangerousness is just a convention to get someone to treatment. Once in treatment the concept of dangerousness is forgotten. It is a device which enlarges and thereby confuses the apparent size of the problem.” (Ibid.)
As Dr. Rubin notes, there should be some agreement about what kinds of behavior constitute such violence, actual or threatened, as to fall within the category of dangerousness. He suggests the following:
*705 1. Crime for which defense of insanity invoked.
2. All crimes.
3. Felonies.
4. Crime for which maximum sentence given.
5. Crimes categorized as violent.
6. Crimes that are harmful, physical or psychological.
7. Any conduct, harmful or threatening.
8. Conduct provoking retaliation.
9. Violence toward self.
10. Any combination of the above.
{Ibid., pp. 398-399).
Sherman’s history includes all but one of1 the above categories.
It would seem that Sherman is dangerous, if released, under legal guidelines as well. An examination of the learned and progressive decisions of the United States Court of Appeals for the District of Columbia, although dealing with the district’s Sexual Psychopath Act, indicates that Sherman’s predictable dangerousness would meet even the high standards established by this advanced court. From the information and expert opinion now before me, it is clear that there is a reasonable foreseeability that, if Sherman is released, a dangerous act would occur in the community “ in the reasonably foreseeable future ” (Rosenfield v. Overholser, 262 F. 2d 34, 35 [1958]), and that there would exist a £ £ high probability of substantial injury ’ ’ (Millard v. Harris, 406 F. 2d 964 [1968]; Cross v. Harris, 418 F. 2d 1095, 1097; see, also, Dershowitz, Psychiatry in the Legal Process: A Knife that Cuts Both Ways, Harvard Univ. Law School Sesquicentennial Address, Sept. 22, 1967).
It is not essential under the law that dangerousness be coupled with mental illness, or that release necessarily follow upon recovery of sanity. It is true that an early case held that the commitment of a defendant acquitted by reason of insanity can last only so long as he is insane (People ex rel. Peabody v. Chanler, 133 App. Div. 159, affd. 196 N. Y. 525), but that decision dealt with section 454 of the Code of Criminal Procedure before its amendment, when it provided that an insanity acquitted defendant “ be committed to the state lunatic asylum, until he becomes sane.” (Emphasis supplied.)
Thereafter, subdivision 1 of section 454 was amended eliminating the words ££ until he becomes sane ” and, with subdivisions 2 and 3 which were added in 1960, incorporated in CPL 330.20 in the same language. The key words became ‘ ‘ danger to himself or others ’ ’ rather than recovery of sanity.
*706 This was recognized by the Court of Appeals in People v. Lally (19 N Y 2d 27, 34, supra) where it held in remitting to criminal term of Supreme Court for a hearing pursuant to section 454 of the Code of Criminal Procedure: “ The issues there to be tried are whether appellant may be discharged or released without danger to himself or to others, and, if that question be answered in the negative, whether he is so dangerously mentally ill as to require hospitalization in Matteawan State Hospital * * * If it be determined as a result of the hearing that defendant while not dangerous to himself or others is mentally incompetent and in need of hospitalization the court shall recommit defendant to the State Commissioner of1 Mental Hygiene for confinement in a State civil hospital for the insane.”
The Court of Appeals followed the language of subdivision 2 exactly in construing the section, and provided a three-tiered procedure for resolving the question of what to do with someone who has been found not guilty by reason of insanity:
(1) retention of a defendant if he is a danger to himself or to others, apparently without requiring that he also be mentally ill;
(2) retention, in a ciyil mental hospital, if the defendant is not dangerous but is mentally incompetent and in need of hospitalization ;
(3) if dangerous, and also dangerously mentally ill, hospitalization in Matteawan State Hospital.
The proceedings sub judice would fall within the first category and the question to be resolved is whether Sherman, regardless of mental illness, is a danger to himself or to others if released. (See, also, People v. Corrente, 63 Misc 2d 214.)
Chief Judge Bazelon, in Cross v. Harris (418 F. 2d 1095, supra) also raises the question of what likelihood of harm will justify commitment. I fully concur with his response (pp. 1100-1101): “ It is particularly important that courts not allow this second question to devolve, by default, upon the expert witnesses. Psychiatrists should not be asked to testify, without more, simply whether future behavior or threatened harm is ‘ likely ’ to occur. For the psychiatrist ‘ may — in his own mind — be defining “likely” to mean anything.from virtual certainty to slightly above chance. And his definition will not be a reflection of any expertise, but * * * of his own personal preference for safety or liberty. ’ Of course, psychiatrists may be unable or unwilling to provide a precise numerical estimate of probabilities, and we are not attempting to so limit their testimony. But questioning can and should bring out the *707 expert witness’s meaning when he testifies that expected harm is or is not ‘ likely ’. Only when this has heen done can the court properly separate the factual question — what degree of likelihood exists in a particular case — from the legal one — whether the degree of likelihood that has been found to exist provides a justification for commitment. ’ ’
Further, as shown by the history of the mentally ill persons .released after Baxstrom v. Herold (383 U. S. 107), decided February 23, 1966, a finding of psychosis does not, of itself, support a prediction of dangerousness. Similarly, the absence of psychosis, of itself, would not warrant a prediction of lack of dangerousness. There does not seem to be an inextricable relationship between the two, either medically or historically. However, this is the position which the medical witnesses who •testified all seem to have taken. The Legislature has gone to some length to prevent the courts from falling into similar error by establishing the two distinct categories of “ incapacitated person ” and “dangerous incapacitated person” (CPL art. 730).
As Dr. Rubin states: “It should be clear by now that unlike the belief of some authors criminality and mental illness are not the reciprocals of one another nor does one necessarily follow the other. Both can exist somewhat independently of one another in the same person, or in varied degrees of interdependence. The relationship of emotion or its absence to criminality and mental illness has yet to be charted.” (Rubin, supra, at p. 406).
I am grateful for the help of Dr. Barry, the Director of the Monroe County Mental Health Clinic, for furnishing me with a copy of Dr. Rubin’s very informative article, as well as for providing me with his own. supplemental report of November 8,1972 in which he acutely pinpoints the problems of predictability with which both medicine and the law are obliged to wrestle. Much of what he points out merits direct sampling.
Dr. Barry says: “ The task here seems to be to state with reasonable medical certainty that the individual will never engage in dangerous conduct and, further, to offer a program for the patient following his release from the hospital that can be reasonably expected to contribute materially to that end. Of course, the problem that the Court and the Psychiatrists are Saddled with in such cases is the many opportunities over the years to come which the defendant-patient has to prove us wrong. I feel that we are doing no more than hazarding a guess when we attempt to predict behavior any farther into the future than a few months and even those predictions should be regarded as *708 highly suspect. It also seems to me that no program devised by the department of Mental Hygiene within the limits of its operating philosophy and the existing knowledge of treatment and behavioral control is at all likely to make a real contribution to the desired end. So while the department may be obliged under the statute (GPL 330.20) to come up with such a plan, it may be unable to do so without changing the nature of its operation into a supervisory-investigative one. Since it has been determined clinically that there is no significant likelihood that Mr. Sherman will benefit from any of the available out-patient treatment and/or rehabilitative programs, it seems that the only approach which might be made toward his as yet unspecified potential for dangerous behavior would be to interview him periodically, as well as family members, neighbors, employers and others, to determine whether or not he was slipping back into a pattern of alcohol abuse and whether or not his anger toward his father was reaching incendiary proportions again. He would of course have to be under pain of1 sanction to make himself available for these interviews and, as specified in the statute, be obliged to return to the hospital if it was felt that the potential for dangerous behavior was immediate. I continue to feel that this kind of careful program of behavioral monitoring can best be carried out by investigative-supervisory professionals such as probation officers side by side with mental health professionals. I don’t believe that either group could do the job alone.”
Dr. Barry’s acute analysis of the situation, which conforms with that of Dr. Barton, raises the troublesome question, if the Department of Mental Hygiene is not equipped to respond to ■someone like Sherman, what, in the absence of other legislation, are the courts to do? Here, again, they are being called upon to fill a societal vacuum. But this they may not do. The responsibility, and the response, belong exclusively to the Legislature.
If Sherman’s dangerousness precludes his release, then his responsibility becomes, ineluctably, that of the Department of Mental Hygiene and it must, as the only agency with the tools, adequate or inadequate, strive to develop a therapeutic purpose for Sherman’s confinement. Actually, would not such a purpose be real rather than contrived? Surely there boils inside of Sherman tremendous rage against his father, depression and frustration because of his paralysis, a multitude of memories and resentments embedded within the residiuum upon which rest his growth and development. So long as his paralysis and “ explosive personality ’’coexist, this man cannot function prop *709 erly, either physically or emotionally. Is the science of psychiatry so categorized that it is unable to even try to reconstitute someone like Sherman? (See, e.g., Barnes and Teeters, New Horizons in Criminology, 2d ed., p. Ill, Prentice-Hall, 1951.) Are there no Skinnerian-like techniques available to “ reprogram ” the behavior of someone with a “ personality disorder ”? I do not refer to ‘ ‘ Clockwork Orange ’ ’ surgery, but to long-term therapy. Is “ mental illness ” the only infirmity psychiatry is capable of dealing with in a hospital setting ? What about ‘ ‘ mental disorder ”? Do labels alone form the basis for treatment and, if so, why do the labels themselves change from time to time? (See, e.g., Judge Bazelost’s penetrating discussion in Durham v. United States, 214 F. 2d 862, supra, and Millard v. Harris, 406 F. 2d 964, 967-968.)
And if there is no possible “ treatment ” for someone like Sherman, no techniques available, then, and this must be faced squarely, he must be confined solely because of his dangerousness. As Judge Bazelok, to whom I am indebted for this analysis, observes in United States v. Alexander and Murdock (C.A.D.C., April 21, 1972) ‘ ‘ That confinement would be nothing more or less than unadorned preventive detention.”
Yet, this is obviously what the Legislature intended, what the law in some cases permits (see People v. Schaap, 34 A D 2d 57), and what the record here urges. The Probation Department, which conducted an independent, in-depth investigation at my request, makes the same recommendation. The Probation Department’s investigation is incorporated in a very thorough, intelligent and perceptive report and I wish to express my appreciation to Probation Officer Robert Norton for his part in the investigation and to Harry R. Caliri, Supervising Probation Officer, for his supervisory role in the investigation and the impressive force and eloquence of his writing.
The probation report was marked as an exhibit and copies given to counsel for Sherman and to the Assistant District Attorney before the second hearing on November 9,1972, and at that time Supervising Probation Officer Caliri was present in court and available for examination as to any part of his probation report. Neither counsel chose to put him on the stand and question him. Excerpts of the report are attached to this opinion as Addendum.
For the reasons set forth herein, I find that Sherman presently represents a danger to himself and to others if released and that, in the event of his release, there is no suitable provision for his care and supervision by the Department of Mental *710 Hygiene as required by subdivision 3 of GPL 330.20. Implicit in this finding is that he has failed to meet the burden of proving the contrary by a fair preponderance of the credible evidence, the standard of proof1 required in a proceeding of this kind. (People v. Chapman, 56 Misc 2d 139; see, also, for the same standard in determining competency to stand trial, People v. Gibbons, 63 Misc 2d 354.)
The.application is, therefore, denied and Bruce Arnold Sherman is ordered recommitted to the Commissioner of Mental Hygiene.
ADDENDUM
“We’ve known Bruce Sherman before * * * Deputy Director of Probation Richard P. VanAuker did a presentence investigative report on January 8, 1962 and this investigation was based on Bruce Sherman’s arrest September 27, 1961 for Burglary, 1st Degree, Assault, 2nd Degree and Malicious Mischief.
“ On September 26, 1961, 20 year old Bruce Sherman, along with seven other individuals, went on some drunken rampage and indiscriminately assaulted numerous persons and did extensive damage to an apartment at 664 Clifford Avenue, Rochester, New York and to two bars, the St. Paul Grill and the Silver Dollar Restaurant. This was a notorious case at that time. Bruce Sherman was indicted for Burglary, 1st Degree, Attempted Assault, 2nd Degree, Injury to Property — a Misdemeanor, Assault, 3rd Degree, Unlawful Assembly and Assault, 2nd Degree. On December 14,1961 he was allowed to plead to three misdemeanors, participating in that Unlawful Assembly, Conspiracy to Commit Crime of Assault, 2nd Degree, Conspiracy to Commit Crime of Malicious Mischief.
“ Prior to the arrest in 1961, subject had had numerous traffic infractions in his record. Greece Police records show a rather disturbing juvenile activity.
“ He started an adult arrest record March 1, 1959 when he stole an automobile engine from a citizen; he was adjudicated a Youthful Offender and given a suspended sentence. On May 21, 1961 he had been arrested for Assault, 3rd Degree, which charges were eventually dismissed. * * *
“ On January 16,1962 Mr. Sherman was sentenced to Elmira Reception Center. We wanted to review his institutional behavior and parole conduct but were told, against our surprised dissatisfaction, of New York State Parole’s policy of destroying records over seven years old. Recent review of his arrest record since 1961 again shows various traffic infractions *711 and three Assault, 3rd Degree arrests. There is a pending matter in Canandaigua, New York for Possession of Weapons and Driving While Intoxicated, which charges were placed against him on October 18,1971. There is an existing record at Monroe County Family Court on Bruce Sherman, which highlights the events following the April 15, 1970 shooting of the subject by his father at 268 Arborwood Crescent, Rochester, New York. * # #
“Information on.file in the Livingston County Sheriff’s Department records an Assault, 3rd Degree charge against Bruce Sherman. At that time his sister, Susan Nebbia, complained that about 4:00 a.m. on July 1,1968 Bruce Sherman came oyer to her trailer in Lima, New York and started to pound on the door. Then'he took out a window in her door and unlocked the door and entered the trailer. The report states that he then went to the bedroom where she was sleeping. He picked the lamp off the night table and hit her over the head with it. He then grabbed her around the neck and started to choke her. She managed to get free and then went over to her father’s house.
“ On April 20, 1971 another Livingston County Sheriff’s report has the complaint that Bruce Sherman called his wife, Rita, that evening and wanted to get back together. When she told him no, he stated that he was going to kill her and that he would get her at work, on the road or in the home. * * *
“ The subject’s mother, Mrs. Elizabeth Sherman, a youthful looking energetic 58, feigns coolness but realizes the hot spot middle she’s personally in. She concedes a long term now absolute hatred between her husbarld and son and is torn between •two kinds of loyalties because she has positive feelings and is faithful towards both. She remained uncommunicative on many points of discussion and has nothing to say about future planning. She said that after the shooting of his wife she knew that subject would then try to kill her husband, who Bruce felt was interfering with his marriage. The mother did make a cryptic remark: He really didn’t hate his wife, he hated his father. # # #
“ The. mother admits that father has a deep unshakeable hostile feeling toward his own son (‘ he’s a no good Son of a Bitch who should be dead ’) and quite possibly might shoot and/or kill Bruce. The father is in very poor health from constant heart failures and is somewhat fatalistic. Daughter also recognizes the real danger of the father’s shooting Bruce. Incredibly, perhaps living so long with the situation, daughter Susan Nebbia calmly feels that, on the basis of her State Hospital visits with *712 Bruce, that Bruce would not shoot the father unless the father shoots first (this is some grisly shootout). * * *
“ On October 11, 1972, this Officer and Probation Officer Norton interviewed Bruce Sherman at the Rochester State Hospital. He answered our questions in an emotionally flat but rational way (he said that he plays down his father’s ‘ getting him ’ so as not to give anybody the idea in the State Hospital of paranoia).
“ Probation Officer Norton sees Bruce Sherman, now 30, as a soft spoken, pensive, cunning, mentally alert male who appeared visibly disturbed in a low-key fashion over his confinement to a wheelchair. Mr. Norton underlined his anxiety to be released from the State Hospital because he is disclaiming any need for psychiatric observation, treatment, supervision and/or medication. To probation officer Norton, Bruce Sherman appeared superficially remorseful over killing his estranged wife but he simply and quickly shifts the blame on the fact that he was ‘ insane ’ at the time. He verbalized a regret that it happened but he is at a loss to explain why he killed his wife and not his father (towards whom he harbors a great deal of anger and vindictive feelings). However, he did not comment on his attempt to do so after the shooting of his wife. * * *
“ What kind of person is Bruce Sherman? The trouble with guesswork diagnoses reviewed so far reflect the episode of the £ crime ’ he was involved in. In other words, what would be the diagnosis if the crime was not known and the defendant was not cooperative and uncommunicative in the interview?
“ Courts Clinic Dr. Barry feels that Bruce Sherman is £ passive-dependent ’. Dr. Reynolds said he had an attack of £ psychosis ’. Strong Memorial Hospital made the evaluation that he was £ an explosive personality ’. Dr. Arnsdorff felt that Bruce had a 1 personality disorder resulting in low level of tolerance to stress situation ’. Dr. Tymochko calls subject1 hostile and aggressive, with poor controls and unable to tolerate any great degree of frustration ’. Dr. Libertson said that he was pseudoparanoid ’.
££ Then we ask is this man dangerous? Dr. Menninger once gave an interview and found that a silly question because everybody is dangerous under the right circumstances. Our contention throughout this report is that the special £ circumstances ’ in the Sherman case apparently still remain. * * *
“Why did he kill his wife? We may never know directly. # # *
££ Did Bruce kill his wife to £ punish ’ and£ torture ’ his father? * * *
*713 “ Did Bruce have an elaborate conscious or unconscious plan to continue this torture until he actually killed his father? Indeed after the shooting of his wife, Bruce Sherman went directly to 81 Walworth Road, Nunda, New York and shot three times into his parents’ trailer, presumably to draw out the father in ■the open. However, the Sheriff Deputy came on the scene and apprehended subject at this time. We don’t know the exact intensity of feeling and relationship his father had for Bruce’s wife, Rita, but it existed as a reality. At the present time father is in extremely poor health, is fatalistic because he thinks he’s at death’s door and conceivably might do anything. For an ironic twist of plot, if father ever kills Bruce he may indeed be adjudged ‘ insane ’ at the time of 1 crime ’. Bruce could be a sitting target, one disadvantage of his immobility from paralysis. * * *
“ Firstly, we’d like to comment that we are, along with psychiatrists and psychologists, also participants and sometimes maybe victims of an inexact science, that is, the behavioral sciences.
“In analyzing this case under scrutiny we did not concern ourselves heavily in the artificial concept of 1 insanity ’. Further, we go along with the suggested position of Rochester State Hospital that Bruce Sherman was not ‘ mentally ill ’ (even if we could come up with a universal definition) in the first place. We are not interested in a psychiatric clearance. We did not consider him dangerous because of ‘ mental disease ’ but because he’s ‘ disorganized ’. We did not consider heavily that some people might think him to be intolerably obnoxious in the community..
“We recognize that continued custody will not change his motivations or increase his self control. We are not perversely delighted that Bruce Sherman’s personality is almost entirely made up of shortcomings. We consider that he could be released without danger to himself in the primary sense. (I am not sure that the statute wording was made to cover the improbable situation that he would be in danger if released because of being a target for someone else) * * *
‘ ‘ But in determining whether he could be released without danger to others, we have used two questions once proposed by Professor Dershowitz * * *
“ (1) Which harms are sufficiently serious to justify resort to this rather serious sanction?
“ (2) How likely should the predicted event have to be to justify preventive incarceration?
*714 “ Our answer to the first question is that nothing can he more - serious than homicide as contrasted to something like Burglary, 3rd Degree. Our answer to the second question that there is a high likelihood that Bruce Sherman would continue his life style and/or that his father may trigger tragedy in this case.
“Bruce Sherman is not going to change significantly and there are still too many stresses in his life situation. The killing of his wife underscores the complexity of hidden urges and unconscious motivations, these quirks in personal and interpersonal attitudes, (which in a sense may not be known to subject). Suffice to say his style has been cramped in satisfying his needs hedonistically in an irresponsible manner. He is a failure at being a failure. If life is a game, he has less and less skills to play it. * * *
“ Sherman presents multitude of explosive, dangerous problems to himself and others and he has potential of destroying, figuratively or actually, at least seven people * * * Lastly
our rule has always been: If in doubt, don’t recommend release. On the basis of our experience, such a structured individual presents too great a possible risk for the community * * *
“ Sometimes we enlist the use of time, which might ride out some of the 1 difficulties ’ of this ease. Perhaps time will alter danger elements. For instance, the natural death of1 his father will eliminate personal dangers to himself. * * *
“It is my conclusion also that the State Hospital wants to unload Bruce Sherman and feels trapped that they did not have a hand in the determination of his criminal responsibility and are now stuck with somebody who they feel was not mentally ill at the time of the crime anyway. * * *
“ Although we are against Bruce Sherman’s release from the State Hospital at this time, we reluctantly suggest that the only community agency able to effect an adequate field scrutiny and supervision is the Probation Department. However, we are not geared for that type of service and further wonder on the legality of such an assignment. In the event of this probation service, the residence plan with his brother, Jack, is a better alternative. (Also his residence is in the jurisdiction of this county.) It is unfortunate that, to find out who is right and wrong on the danger angle, we must wait and see what the results are going to be and mean. If it is negative, unfortunately life before death is not retroactive. No matter what happens, it, Would still be unclear whether 1 the sick ’ personality or the social environment triggers the ultimate explosion. We are definitely against the kind of thinking that some people have *715 toward serious sex offenders: Just let them go, the statistical chance of any serious consequence is extremely minor. But why take a chance on letting a tiger loose in the metropolitan area? What harm can a tiger do to a lot of people before he is under control?
“ We consider onrselves in the Probation Department a responsible agency and we have the opinion that we are not ‘ satisfied ’ Bruce Sherman could be released at this time without harm to himself or to others.”.