In the Matter of ALAN D. MILLER, as Commissioner of Mental Hygiene of the State of New York, Respondent. BRUCE A. SHERMAN, a Committed Person, Appellant.

Fourth Department, December 12, 1974.

*Richard J. Evans* for appellant.

*Jack B. Lazarus, District Attorney* (*Melvin Bressler* of counsel), for respondent.

GOLDMAN, J. This appeal presents great human interest issues, the resolution of which depends more largely on psychi-

atric authority than on legal precedent. In dealing with the workings of the human mind we are in a field of science where there are no positive and certain conclusions which can be drawn, no matter how learned and experienced one may be.

Petitioner, a patient at the Rochester State Hospital, committed pursuant to CPL 330.20 (subd. 1), appeals from an order of Monroe County Court recommitting him to the hospital. He has been confined there since May 19, 1972, after having been acquitted, by reason of insanity, of the murder of his wife. At his trial on the murder indictment two court-appointed psychiatrists testified that because of mental disease petitioner, on the date he killed his wife, lacked substantial capacity to know either the nature and consequences of his acts or that such conduct was wrong. With no countervailing evidence the court could render no verdict other than one of acquittal (*People* v. *Kelly,* 302 N. Y. 512).

About two months after he was committed the Special Release Committee of the Rochester State Hospital, consisting of three staff psychiatrists, examined petitioner and recommended that he be discharged and released from the hospital, for he showed "no evidence of being mentally ill or in need of continued hospital care". Acting upon this report the Commissioner of Mental Hygiene requested the County Court to initiate proceedings to release petitioner, pursuant to CPL 330.20 (subd. 2). The County Court thereupon requested the Monroe County Health Clinic to examine petitioner to determine whether he was capable of being released without danger to himself or others. The Director of Monroe County Mental Health Services selected two qualified psychiatrists to examine petitioner and report their findings. Both psychiatrists concurred with the report of the Hospital Release Committee that petitioner gave no evidence of mental disorder, that he was at that time rational and without psychosis and that he could be released without danger to himself or others.

On October 2, 1972 a CPL 330.20 (subd. 3) hearing was held before Monroe County Judge DAVID O. BOEHM, who had presided over petitioner's homicide trial. After a second hearing on November 9, 1972 Judge BOEHM, in an able opinion (73 Misc 2d 690) in which he carefully reviewed all the evidence, analyzed the applicable statutory and decisional law and considered in depth the writings of legal and medical scholars, denied the application and recommitted petitioner to the Commissioner of Mental Hygiene.

One considering the question at bar must not only have the wisdom of a Solomon and an Aesculapius, but also the insight of a talented clairvoyant. Any decision will be fraught with the possibility of grave error. In balancing the interests one runs the risk of preventively detaining a completely sane person or releasing one who by psychiatric judgment is sane but whose prior history contains several incidents of assault of persons and property and such acts of violence as attempted suicide, shooting at the residence of his mother and father and the killing of his wife. Difficult as it may be to find a point between these two dilemmas, one must be found. In such a situation great reliance must be had not only on the testimony of experts but of any person or circumstances which can guide one to the best possible, informed decision. The only witnesses who testified at the hearing were four psychiatrists, all of whom concluded that petitioner should be released, for he was not suffering from mental disease or defect, was without psychosis and would not be a danger to himself and others.

The testimony of the witnesses is thoroughly covered in the trial court's opinion and only brief references to that testimony will be made here. Notwithstanding their conclusions, several of the doctors testified that petitioner was a psychopath or sociopath who had a " psychopathic disorder of sentiment and values and control of aggressive actions at times ", that he had an " explosive personality * * * which is a personality disorder " involving a low-level tolerance to " stress situations ", that " he had a history of transient psychosis ", that because of his excessive drinking habit one should " look toward monitoring in the future certain aspects of his behavior ", that " according to the history (he has been) basically very hostile, aggressive person with poor controls and unable to tolerate any great degree of frustration ", that he was almost " a certain danger * * * to people in whom he has a certain relationship * * * that it is prudent to think there will be an increased danger generally to people that cross this man, but particularly to those involved in this emotion situation * * * namely his father * * * or other father figures; that is, people who have a position of authority " and that " he is a greater risk to certain people than the average person ". Notwithstanding their recommendations that petitioner should be released, each doctor refused to predict petitioner's future behavior. They did, however, all agree generally that considering the absence of psychosis petitioner, with certain controls, was capable of living a normal life without being a menace to society. The most

important control emphasized was the elimination of alcohol abuse, and one psychiatrist emphatically stated that "all bets would be off if he were to return to abusing alcohol".

At the request of the court Dr. Barton, Director of the Rochester State Hospital, specified several conditions which he felt should be imposed if petitioner were to be released. These included constant use of antabuse, a drug which makes the ingestion of alcohol very unpleasant, a rehabilitation program at Strong Memorial Hospital to assist him to become more mobile so that he would not be confined to a wheelchair, that he be given some education courses and particularly vocational training to assist him to become self-sufficient and that he should become a regular out-patient at the Rochester State Hospital although he expressed doubt "that it would help". The doctor's final conclusion was that "assuming that he would respond to these things he would be less of a menace than he is at the moment, but more of a menace than the average man".

In an effort to deal with the situation at hand the Legislature has carefully prescribed the procedures by which the petitioner can seek discharge from the custody of the Commissioner of Mental Hygiene. However, to reach a substantive result under CPL 330.20 (subd. 2) requires much more than following defined procedures. The sole criteria which the statute establishes is that the committed individual shall be released if he is no longer a "danger to himself or to others". The Court of Appeals in *People* v. *Lally* (19 N Y 2d 27) upheld the constitutionality of the predecessor statute (Code Crim. Pro., § 454) and further held that if requested, a committed person is entitled to a jury trial on the question of sanity. The statute has a twofold purpose, to determine whether the petitioner is no longer insane and whether he would be a danger if released. By psychiatric evaluation all of the experts categorically stated that petitioner is sane and that there is nothing further which can be done for him at the hospital. It is with the second requirement, dangerousness, that the difficulty arises. The experts, as has been demonstrated by quotations from their testimony, were well aware of the conundrum and each refused to predict what the future will hold for petitioner. They refused to give an opinion as to his future behavior and one psychiatrist answered the question by saying that "the gift of prophecy is not included in the psychiatric qualifications". They were certain of only one finding, that petitioner was not suffering from mental disease or defect.

Therefore, we must consider whether the Legislature has in fact established an impossible burden for an individual to meet or for the courts to determine. Can any court, at any time, state with any reasonable degree of assurance what any individual will or will not do in the future? If indeed it cannot, is dangerousness per se a proper standard to assess an application for release from a present commitment by reason of insanity? Or must dangerousness be viewed within rather than apart from the context of mental illness, disease or defect? These questions are not altogether theoretical. Not only do they form the central core of the decision of the trial court in the instant proceeding, but they have also been the subject of much debate in recent Federal decisions involving statutes similar to New York's.

One of the country's ablest jurists, Chief Judge DAVID L. BAZELON, of the United States Court of Appeals, District of Columbia, the author of *Durham* v. *United States* (214 F. 2d 862), a decision which greatly expanded our understanding of the term "mental disease or defect", has written extensively upon the subject of "dangerousness". In *Covington* v. *Harris* (419 F. 2d 617, 627) Judge BAZELON put into sharp focus in the following statement the dilemma which confronts any court in finding solution to the problem:

"As we recently made clear in Millard v. Harris [406 F. 2d 964, 969, 971] 'dangerousness' is a many splendored thing. Unless muzzled by discriminating analysis, it is likely to weigh against nominally competing considerations the way a wolf weighs against a sheep in the same scales: even if the sheep is heavier when weighed separately, somehow the wolf always prevails when the two are weighed together. Keeping dangerousness on a taut leash is especially difficult where there is danger of murder, since the danger is admittedly grave and since its improbability, which theoretically discounts its gravity, is exceedingly difficult to quantify.

"Moreover, once a man has shown himself to be dangerous, it is all but impossible for him to prove the negative that he is no longer a menace."

On the other side of the same issue is the Supreme Court's holding in *Baxstrom* v. *Herold* (383 U. S. 107), that the commission of criminal acts does not give rise to a presumption of dangerousness which, standing alone, justifies substantial difference in commitment procedures and confinement conditions for the mentally ill and dangerous (see, also, *Bolton* v. *Harris*, 395 F. 2d 642, 647; *Cameron* v. *Mullen*, 387 F. 2d 193, 201).

Any decision in this matter walks a thin line between preventative detention and exposure of the public to violence. Can we justify retaining an individual in a State hospital for the insane upon the assumption that he may be dangerous to others if released? Judge BAZELON answered this question by restating it in *Millard* v. *Harris* (406 F. 2d 964, 973) where he wrote that evaluating the statute raises "constitutional issues of the gravest magnitude * * * Substantively, there is serious question whether the state can ever confine a citizen against his will simply because he is likely to be dangerous in the future, as opposed to having actually been dangerous in the past". Candor requires one to admit that in a very real sense we are groping for answers which when found must be equivocal. Dr. Barton, director of the hospital, from whose testimony we have quoted, in a recent paper, "Bad or Mad? — Prison or Hospital?", portions of which were published in a local newspaper, makes this interesting observation: "It seems to me that after a man has committed an unlawful act, it is prudent and just to presume he will repeat the offense; that no matter what the cause of the failure of self-restraint may be — altered consciousness, delusional belief, uncontrollable passion or sheer stupidity — the Law should presume that similar failures will occur again." Following this statement to its logical conclusion, should any court release petitioner?

It has now been more than two years since the County Court hearings. In a matter such as the case at bar it would be unwise to make a judgment based on two-year-old evidence. To do so would be a disservice both to petitioner as well as to society. This elapse of time has given the authorities of the hospital an opportunity to observe further petitioner's conduct and to bring to the court in a new hearing additional facts and opinions. The psychiatrists who testified in large part relied on the Special Release Committee's findings, which were made after petitioner had been in the hospital approximately only two months. It has now been three years since petitioner's acquittal of the murder charge and two and one-half years since his commitment to the hospital. It naturally follows that the experts will be able to assist the hearing court with more solid proof, conclusions and recommendations. Without disparaging or denigrating the profession of psychiatry, we suggest that the witnesses summoned to the new hearing should include hospital employees such as nurses, orderlies, housekeepers and others who have had daily or frequent contact with petitioner. They will be able to relate to the court petitioner's actions and reactions to the

stresses and strains which are experienced in the usual happenings of each day. One may put his best foot forward when interviewed or examined by one he knows will be consulted on the question of his release, whereas he would be more likely to give expression to his natural tendencies when dealing with nonprofessionals whom he would not expect to be directly involved in decision making. It is suggested that a display of ungovernable temper when one has been inconvenienced by a housekeeper having just washed the floor may be more revealing and indicative of future conduct than the impression one gives when he sits across the desk or lies on the couch of a psychiatrist. Qualified psychiatrists can render great assistance in assessing an individual's mental condition. (See *United States* v. *Alexander,* 471 F. 2d 923; *Dixon* v. *Jacobs,* 427 F. 2d 589; *Bolton* v. *Harris,* 395 F. 2d 642, *supra.*) However, the court should reach out for any available evidence which bears on petitioner's conduct while in the hospital.

On this appeal petitioner, for the first time, urges that the trial court erred in permitting the District Attorney of Monroe County to appear in the proceedings while not requiring the Attorney-General to represent the commissioner. The statute (CPL 330.20, subd. 2) requires that the District Attorney should be notified and that the " commissioner * * * must transmit a copy of such application and report to the district attorney of the county from which the defendant was committed ". The commissioner initiated this proceeding to secure petitioner's release. The Attorney-General would represent the commissioner and without the District Attorney present no one would represent the public, which certainly has a real interest and stake in the outcome of the application. We said in *Matter of Miller* (*Lee*) (46 A D 2d 999) that " the special interest which the public has acquired in the confinement and release of people in this exceptional class of acquitted persons results from the fact that there has been a judicial determination that they have already endangered the public safety and their own as a result of their mental conditions. The public acquires a special interest in their confinement and release, which therefore must be considered by the court. When consideration is being given to the release of such a person, that public interest must be weighed against his claimed right to be set free ". We find no merit in petitioner's position on this point.

This matter should be remitted to Monroe County Court for a new hearing.

184

MARSH, P. J., MOULE, MAHONEY and DEL VECCHIO, JJ., concur.

Order unanimously vacated and matter remitted to Monroe County Court for a new hearing in accordance with opinion by GOLDMAN, J.