Oscar Murov, J.
The petitioner, Laurence Lublin, challenges his continued commitment at Central Islip Psychiatric Center where he has been confined since May 14, 1974, after being transferred there from the Mid-Hudson Psychiatric Center at New Hampton, New York. Lublin had been placed in the custody of the Commissioner of Mental Hygiene following his acquittal by reason of insanity of the murder of his wife.
Within months after Lublin’s arrival at Central Islip Psychiatric Center, a special release committee was established by the hospital director for the purpose of making a determination as to whether or not Lublin was ready to be discharged from the said psychiatric center. The committee, thereafter, on September 11, 1974, filed its report certifying that Lublin was not then ready to be released. A second special release committee was appointed and on December 5, 1974, this second committee filed its report certifying that Lublin was ready for release. The second report was forwarded to the hospital director and he, in turn, signed it "sometime in January of 1975”.
The report, together with Lublin’s hospital record, was forwarded to the office of the New York State Commissioner of Mental Hygiene. A "multi-disciplinary panel” was formed at the request of the commissioner for the purpose of examining Lublin, making findings of fact, and reporting its recommendations to the commissioner concerning Lublin’s suitability for discharge.
Members of the hospital ward staff revealed in interviews with the panel that they felt Lublin was not psychotic but that he was manipulative, never failing to resort to exploitative techniques to attain his desired ends. They felt that *50 Lublin was better adjusted to the center environment than when he first arrived largely because the staff had come along further in its efforts to adjust to him than vice versa. It was the consensus staff opinion that Lublin still was potentially violent.
Two treating psychiatrists and a unit chief were also interviewed by the panel. They tended to concur with the ward staff as to Lublin’s manipulative and exploitative traits. The physicians were unanimous in their opinion that Lublin had never, since his admission, shown symptoms or signs of psychosis and that no useful purpose would be served by his continued commitment at Central Islip.
The panel concurred with the views of those interviewed that Lublin was not psychotic. Their summary of all of their interviews reveals that all of those canvassed, including the three physicians, "feared his discharge to the vicinity of their own home because he would harass or possibly again become homicidal”. (Panel Report, addressed to Long Island Regional Director, Department of Mental Hygiene, dated Feb. 28, 1975).
The panel reported it was unable to assess Lublin’s dangerousness. They felt that, if released, Lublin would submit to chemotherapy only as he saw fit and that "he will encounter difficulty in his relationship with others because of his demanding, manipulating and dependent behavior”; that he would be unlikely to function well in a work situation, and that he would again gravitate to those on whom he felt he could depend.
On the basis of this report, the Commissioner of Mental Hygiene advised the Suffolk County Court that he was unable to recommend Lublin’s release "with any confidence that hazard would not attend on such release”.
As a result of being advised of the posture of the Department of Mental Hygiene, Lublin himself filed this pro se petition with the court (CPL 330.20, subd 5). Two physicians appointed by the court examined Lublin, and after such examination, reported that Lublin could be released from the hospital without danger to himself or others.
This court, not being satisfied that Lublin could be discharged or released on condition without danger to himself or others, directed that a hearing be held for the purpose of making its determination (CPL 330.20, subd 3). The District Attorney, who has been served with a copy of the petition (CPL 330.20, subd 2) requested, and was granted, leave to *51 appear in opposition to the application (Matter of Miller [Lee], 46 AD2d 999).
At the commencement of the hearing Lublin signed a written waiver of his right to a jury trial as guaranteed by People v Lally (19 NY2d 27); Matter of Lashway v Hanes (78 Misc 2d 979); Mental Hygiene Law, § 31.35; and within the spirit of Baxstrom v Herold (383 US 107).
As to the burden of proof, the District Attorney now contends that the burden of proof as to whether or not Lublin will be retained rests upon those who would oppose release and must be proved beyond a reasonable doubt. Lublin claimed the burden as his own and proceeded, upon that premise, to attempt to establish by a preponderance of the evidence that he was suitable for release upon condition without danger to himself or others.
The court here recognizes that the position of the opposition upon the issue of "burden of proof’ is not without substance, particularly in view of a series of Supreme Court decisions imposing the burden upon the People in cases where a potential loss of liberty or continued deprivation of liberty is involved. (See, e.g., Mullaney v Wilbur, 421 US 684; Matter of Winship, 397 US 358; Matter of Gault, 387 US 1; see, also, The Rights of the Person Acquitted by Reason of Insanity: Equal Protection and Due Process, 24 Maine L Rev 135.) Winship and Gault were concerned with proceedings regarding juvenile delinquents. The theory articulated in Winship to support the reasonable doubt standard is that where there is such a significant interest as liberty at stake, the margin of error inherent in the judicial process must be reduced as to the party with that interest. This reduction is accomplished by placing the burden of persuasion beyond a reasonable doubt on the other party. The court quoted from Matter of Gault as follows (p 366): " '[a] proceeding where the issue is whether the child will be found to be "delinquent” and subjected to the loss of his liberty for years is comparable in seriousness to a felony prosecution.’ ” Winship held that the due process clause requires the State to prove beyond a reasonable doubt every element of the offense charged in any proceeding, juvenile as well as criminal. The analogy between the juvenile and the patient, at least as far as their relative due process rights are concerned, is most competently drawn in the Maine Law Review article cited hereinabove.
Nevertheless, the Supreme Court has not, as yet, declared *52 itself on the precise issue herein and, until such time as it does, this court shall enforce the standard of proof heretofore applicable in this State (Greenwald, Disposition of the Insane Defendant After "Acquittal” — The Long Road From Commitment to Release, 59 Journal of Criminal Law, Criminology and Police Science 583, 589 n 67), which requires the patient to prove by a preponderance of the evidence that he may be discharged or released upon condition without danger to himself or others (People v Lally, 19 NY2d 27, supra; Matter of Miller [Sherman], 73 Misc 2d 690, vacated and remitted for a new hearing 46 AD2d 177; People v Chapman, 56 Misc 2d 139; Bolton v Harris, 395 F2d 642; Millard v Harris, 406 F2d 964).
At the hearing, each of the expert witnesses testified as may have been anticipated depending upon whether they were called by Lublin or by those opposing release. All but one of the experts was of the opinion that Lublin was not psychotic, yet none but one would give approval to unconditional release. Wherever release was deemed appropriate for Lublin, continued contact and supervision was recommended in the form of some "out-patient”, "convalescent care”, or "family care” plan.
It does appear that there is an essential difference between out-patient and family care plans in that the former is made available to patients not committed while the latter is provided for patients of the institution not yet discharged therefrom (27 NY Jur, Hospitals and Asylums, § 39; see, also, Mental Hygiene Law, § 29.15, subd [d], eff until Mar. 31, 1976).
The term "convalescent care” is not defined in the current Mental Hygiene Law enacted by chapter 251 of the Laws of 1972 to supercede the former Mental Hygiene Law (L 1909, ch 32 as generally amd by L 1927 ch 426). The former law contained a reference to convalescent status in the old section 87. Superceding sections 29.11 and 29.15 of the present Mental Hygiene Law omits all reference to convalescent care or status. The term has been loosely defined by one of the District Attorney’s witnesses and it is used in quite another context in a Department of Mental Hygiene memorandum submitted to the court as an exhibit. The witness was of the opinion that there was no specific definition for convalescent care and that such care might include out-patient treatment. The department memorandum appears to equate convalescent care with family care — at least for the purpose of effecting *53 department policy against the discharge or temporary release of patients under order of a criminal court.
No statutory mandate has been found to support such a policy. Subdivision (d) of section 29.15 vests powers in the director of a hospital facility, with the commissioner’s approval, to make arrangements for family care for any patient where such care would be deemed beneficial. The patient, however, continues to be in the custody of the department until he is discharged. The court’s function, in this regard, is to order the discharge or release on condition of a committed person where the court is satisfied that such discharge or release can be effected without danger to such person or others. If the court is not so satisfied, the applicant must be recommitted (CPL 330.20, 330, subd 3).
The standards set by law for determining whether or not to release the patient varies from jurisdiction to jurisdiction. Certain States variously require proof that the patient is "sane”, "no longer mentally ill”, "restored to sanity”, "entirely and permanently recovered”, "sufficiently recovered”. Other States pay little heed to the question of mental illness and allow release to patients who are not dangerous. Still other States allow release only where the patient is both sane and not dangerous. (Greenwald, Disposition of the Insane Defendant After "Acquittal” — The Long Road From Commitment to Release, 59 Journal Criminal Law, Criminology and Police Science 583, 587-588, supra) The standards for release in New York rest upon a finding that the patient is no longer a danger to himself or others (People v Lally, 19 NY2d 27, supra; Matter of Miller [Sherman], 73 Misc 2d 690, vacated and remitted for a new hearing 46 AD2d 177, supra; CPL 330.20).
The very concept of dangerousness is vague and elusive. (Goldstein and Katz, Dangerousness and Mental Illness, Some Observations on the Decision to Release Persons Acquitted By Reason of Insanity, 70 Yale LJ 225.) Experienced medical practitioners themselves have difficulty dealing with the concept. (Berg, 26 Los Angeles Bar Bull 21.) While the concept is deeply colored by psychological and behavioral overtones, writers on the subject are loathe to entirely entrust the responsibility for making the determination as to "dangerousness” to the experts. Goldstein and Katz would favor a sharing of the responsibility between court and expert. Their eminent associate, Professor Dershowitz, views the concept as *54 being fraught with legal significance, involving as it does the use of compulsion or denial of freedom, and would wrest the decision away from the psychiatrists favoring determinations by legal minds, instead. (Dershowitz, Psychiatry in the Legal Process: "A Knife That Cuts Both Ways” 51 Judicature 370.) Dershowitz observes that when psychiatrists testify that a patient is likely to be dangerous, he may, in his own mind, be defining "likely” to mean anything from virtual certainty to slightly above chance, and that the definition is not a reflection of expertise but the psychiatrist’s own personal preference for safety or liberty. Another writer reports that expert testimony will likely be slanted "to lead the jury to the same conclusions as his own”. (Arens, 1 Law and Society Review 41, 47 [June, 1967]) Chief Judge Bazelon of the United States Court of Appeals for the District of Columbia Circuit, author of many of the landmark opinions appearing in the Federal Reporter, counsels us in Cross v Harris (418 F2d 1095, 1100-1101): "It is particularly important that courts not allow this second question [likelihood of harm] to devolve, by default, upon the expert witnesses. Psychiatrists should not be asked to testify, without more, simply whether future behavior or threatened harm is 'likely’ to occur.”
The term "dangerous” has been variously defined to include a reasonable foreseeability of danger to a patient or the community (Rosenfield v Overholser, 262 F2d 34), a high probability of substantial injury (Cross v Harris, 418 F2d 1095, supra; Millard v Harris, 406 F2d 964) the likelihood of serious harm (People v McNelly, 83 Misc 2d 262) or either one of a set of behavioral modes classified as dangerous including: (1) only the crime for which the insanity defense was successfully raised; (2) all crimes; (3) only felonious crimes (as opposed to misdemeanors); (4) only crimes for which a given maximum sentence or more is authorized; (5) only crimes categorized as violent; (6) only crimes categorized as harmful, physical or psychological, reparable or irreparable, to the victim; (7) any conduct, even if not labelled criminal, categorized as violent, harmful, or threatening; (8) any conduct which may provoke violent retaliatory acts; (9) any physical violence towards oneself; (10) any combination of these. More or other than the kind of offense for which the defense was. raised was intended, for the statute specifically adds dangerousness to self as a basis for confinement. (Goldstein and Katz, Dangerousness and Mental Illness, Some Observations on the Decision to Release *55 Persons Acquitted by Reason of Insanity, 70 Yale LJ 225, 235, supra; see, also, Rubin, Prediction of Dangerousness in Mentally Ill Criminals, 27 Arch Gen Psychiat 397, 398; Matter of Miller [Sherman], 73 Misc 2d 690, vacated and remitted for new hearing 46 AD2d 177, supra).
In remitting for a new hearing two years after the trial court decision recommitting Commissioner Miller’s patient, the Appellate Division Justices urged that witnesses summoned to the new hearing include hospital employees such as nurses, orderlies, housekeepers and others who have had daily or frequent contact with the patient, in addition to psychiatric experts (Matter of Miller [Sherman] 46 AD2d 177, 182). No less an assemblage paraded to the witness box at the hearing held before this court.
Six expert witnesses testified that Lublin is neither a danger to himself nor to others. The testimony of two of them is suspect since they had only months earlier expressed some anxiety concerning petitioner’s harassing and/or homicidal proclivities. The testimony of one of the latter two is accorded little weight here since that witness seemed inclined to take a stand consistent with the position previously adopted by him whereby he "went along” with the recommendations of his colleagues.
The director of the facility favored Lublin’s release according to some ill-defined program for aftercare or convalescent care. The recommendation of the director is construed by Lublin’s counsel as a tacit admission or implication that the director felt the petitioner is not "dangerous”. The court noted from the director’s testimony that he studiously avoided contact with Lublin. In evaluating the director’s testimony, the court is unable to draw the same inferences as does counsel, as to the director’s assessment of Lublin’s dangerous potential.
One of the experts, the author of the multi-discipline panel report, recommended out-patient treatment for Lublin but declined to address himself to the issue of dangerousness.
In summary, four of the experts gave unassailable testimony in favor of Lublin’s readiness for release, but only one of them recommended outright release.
Two experts introduced by the District Attorney, unequivocally oppose release. It was their opinion that Lublin possessed the psychological bent to seek deep dependent personal relationships with others of the precise kind that resulted in *56 his wife’s death; that Lublin would not participate in a treatment plan administered in an unstructured setting.
It has been urged that potential danger to the community and to Lublin himself dissipates if emotionally dependent relationships are avoided or restrained. The court feels the likelihood that Lublin will avoid, be unable to, or be effectively restricted from, pursuing emotionally dependent relationships runs contrary to both his nature and to human nature. The court would add that Lublin’s record of co-operation with authorities makes it doubtful that he would long abide by any rules insulating him from those to whom he is drawn or that he would continue to accept medication necessary to keep him in a tranquil state.
The testimony of hospital personnel tended to establish only that Lublin was from time to time embroiled in argument with others resulting in shouting and physical action on the part of either or both sides. No one testified that he was easy to live with. The contrary would be more likely the consensus opinion.
The presumption of continuing insanity first pronounced in Orencia v Overholser (163 F2d 763), and cited with approval in Durham v United States (214 F2d 862), has been the subject of recent attack. (Morris, The Confusion of Confinement Syndrome Extended: The Treatment of Mentally Ill "Non Criminal Criminals” in New York, 18 Buff L Rev 393.) Any presumption of dangerousness predicated upon an accusation has been unequivocally rejected as constitutionally infirm by the same Judge Bazelon who authorized the Durham opinion, (supra), (Bolton v Harris, 395 F2d 642, supra; see, also, Gomez v Miller, 341 F Supp 323; Comment, Criminal Law — Insane Persons — Criminal Defendant Who Has Been Adjudicated Insane and Committed to State Hospital Can Be Conditionally Released Although He Has Not Been Restored To Reason, 6 Rutgers-Camden LJ 792). A presumption of dangerousness predicated upon past behavior was rejected in Specht v Patterson (386 US 605), based upon the Bolton rationale.
Accordingly, release herein does not depend upon whether the petitioner has overcome any presumption of dangerousness, but whether or not he has established by a fair preponderance of the credible evidence that he is no longer a danger to himself or to others. If the evidence is equally balanced, or if it leaves the trier of fact in such doubt as to be unable to decide the controversy either way, judgment must be given *57 against the party upon whom the burden of proof rests (Roberge v Bonner, 185 NY 265). "A fair preponderance of evidence does not necessarily mean a greater number of witnesses; 'witnesses are weighed, not counted’ ”. (Richardson, Evidence, [10th ed], § 97, p 74.) The court has carefully weighed and sifted the evidence and hereby determines that the petitioner has failed to sustain his burden of proving he is ready for release upon condition without danger to himself or others. The petition for such release is therefore denied and the petitioner is ordered recommitted.
The decision herein is not designed to, nor should it, obstruct therapeutic goals. If those charged with the responsibility of caring for the petitioner feel he will benefit from a less restrictive environment than confinement affords, it is within their power to provide such an environment (Mental Hygiene Law, § 29.15). It should be borne in mind that therapy under the least restrictive alternative is the purpose and manner of the continued confinement of Mr. Lublin (Cross v Harris, 418 F2d 1095, 1102, supra; Covington v Harris, 419 F2d 617, 623; see, also, Bazelon, Institutionalization, Deinstitutionalization and the Adversary Process, 75 Col L Rev 897). Should the hospital at any time abandon the pursuit of these goals, such a decision would be an appropriate subject for judicial review (Covington v Harris, supra, p 624).
In view of the foregoing, it is the judgment of this court that the petitioner, Laurence Lublin, is directed to be retained at the Central Islip Psychiatric Center until such time as it is established he may be discharged or released upon conditions without danger to himself or others.