No. 14533

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

_____

STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

RAYMOND L. OLSON,

Defendant and Appellant.

_____

Appeal from;  District Court of the Nineteenth Judicial District,
Honorable Robert M. Holter, Judge presiding.

Counsel of Record:

For Appellant:

R. T. Randono, Great Falls, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Allen Chronister argued, Assistant Attorney General, Helena,
Montana
William A. Douglas, County Attorney, Libby, Montana

_____

Submitted:  March 26, 1979

Decided: ⠀⠀⠀⠀⠀⠀

Filed:

*Thomas J. Kearney*
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

This appeal is taken from a judgment denying Olson's petition for release from the State Hospital in Warm Springs. Findings of fact, conclusions of law and judgment were entered on August 14, 1978, in the District Court of Lincoln County by the Honorable Robert M. Holter.

In 1969 Olson was charged with two counts of rape. He gave notice of intent to rely on the defense of insanity. The case was submitted to the jury and a guilty verdict was returned. On appeal the judgments were reversed and a new trial was ordered. State v. Olson (1971), 156 Mont. 339, 480 P.2d 822.

Before the second trial the judge found Olson "not guilty" by reason of insanity and ordered him committed to the State Hospital on March 18, 1971. The committment order referred to the depositions and testimony of Drs. Miguel F. Gracia and Robert A. Wetzler, qualified psychiatrists who had examined Olson.

In 1972 Olson walked away from the Warm Springs facility and went to Great Falls. From 1972 until 1977 Olson lived in Great Falls with his wife and family. He obtained a job, had a telephone directory listing, and a driver's license all under his own name. He joined both a local union and the local chapter of the Moose Lodge, again using his own name.

On February 17, 1977, an order was entered for the issuance of a bench warrant directing:

"IT IS HEREBY ORDERED:

"That Bench Warrant issue for the arrest of the captioned Defendant, Raymond LeRoy Olson, and that he forthwith be returned to this Court for purposes

of determining whether he should be released from custody of Warm Springs State Hospital without Bail." (Emphasis added.)

Olson's period of residence in Great Falls was not completely without incident. In September or October of 1976 Olson unexpectedly appeared in the bedroom of one Karla White at about 2:00 or 3:00 a.m. while she was sleeping. Olson left when told to, although, as the State contends, the presence of White's male companion may have hastened his retreat.

A year later on September 1, 1977, Olson assaulted the same woman in the early morning hours. In this attack, Olson grabbed White, knocked her down, and shoved her face into the concrete, threatening to break her neck. Olson apparently did try to snap White's neck before dragging her off into a vacant field. Although there was no sexual assault, Olson's continuing physical assault was interrupted only by the arrival of the police. Olson claims he was upset over White's treatment of her ex-husband, Olson's friend. This incident led to Olson's arrest and being charged with misdemeanor assault and unlawful restraint. The charges were ultimately dismissed.

Although the order of February 17, 1977, directed that there be a hearing to determine Olson's status and although he was taken to Kalispell and held in jail for at least a week, there was no hearing and he was returned summarily to the State Hospital.

On December 27, 1977, Olson petitioned for release. He was subsequently examined by Dr. Hamilton C. Pierce and Dr. George Gelernter, both qualified psychiatrists, whose reports were introduced as exhibits at the hearing on August 3, 1978. In addition to these evaluations, Olson and his

wife testified and 35 letters of personal reference from Olson's supervisors, co-workers, and friends were introduced as exhibits without objection. Finally, an interim social history and a mental status examination report and evaluation prepared during Olson's confinement at Warm Springs in late 1977 were submitted on Olson's behalf. The substance of these reports as well as of the evaluations by the two private psychiatrists was that Olson suffered no mental illness and should be released.

The State, in opposing the petition for release, introduced parts of the psychiatric evidence from the 1970 rape trial, specifically the testimony of Dr. Wetzler, along with testimony from Karla White, the woman Olson allegedly attacked in 1977.

The District Court denied Olson's petition citing in its findings the testimony of Dr. Wetzler in 1970 that Olson had a "grave defect, a grave illness," that the two incidents involving Karla White were similar to the original rapes, and that Olson had received no psychiatric treatment since 1972. The final finding and conclusion of the District Court were:

> "5. That this Defendant is now suffering from a mental disease or defect which renders him unable to control himself at times and which results in his being a danger to the person of others.
>
> ". . .
>
> "[Conclusions of Law] That the Petition of the Defendant for release from the Montana State Hospital should be denied by reason of the fact that this Defendant remains a danger to the person of others."

Olson was ordered returned to Warm Springs State Hospital. From the denial of his petition, Olson appeals.

Olson broadly asserts that the issue for review is whether the District Court erred in denying his petition.

The State breaks this issue down and addresses the points Olson pursues:

1. Whether the transcript of Dr. Wetzler's testimony from the prior trial was admissible.

2. Whether the District Court could rely on the testimony of the woman Olson allegedly attacked.

3. Whether the evidence was sufficient to support the District Court's judgment.

By this appeal from the denial of his petition for release, Olson specifically challenges the use of the testimony of two witnesses by the lower court: (1) the transcribed testimony of Dr. Wetzler as given in Olson's 1970 rape trial; and (2) the testimony of Karla White as to two incidents involving her and Olson. We will consider the testimony of each separately.

Testimony of Dr. Wetzler. This testimony as presented to the District Court by the State consisted exclusively of the transcript of Wetzler's testimony at Olson's trial in 1970. This testimony was based on Wetzler's two-hour examination of Olson in January 1970. Wetzler has neither examined Olson since 1970, filed any sort of updated evaluation, nor did he appear at the hearing on Olson's petition. In short, this transcribed testimony relates to Olson's mental condition as of January 1970.

Olson petitioned for release under section 95-508, R.C.M. 1947, now sections 46-14-301 through -304 MCA, which establishes the procedure for commitment to and release from the State Hospital at Warm Springs following acquittal on the ground of mental disease or defect. The provisions of that section clearly call for a determination of the mental condition of a committed person as of the time of the peti-

tion for release. E.g., section 95-508(1) (hearing "to determine his _present_ mental condition"), (2) (requiring the appointment of two psychiatrists to examine the person after the filing of a petition), now sections 46-14-301(2) and 46-14-302(2) MCA. Accord, Rouse v. Cameron (D.C. Cir. 1966), 373 F.2d 451, 461 n. 43; State v. Cuvelier (1978), 175 Conn. 100, 394 A.2d 185, 189; State v. Fields (1978), 77 N.J. 282, 390 A.2d 574, 585; People v. Giles (Colo. 1976), 557 P.2d 408, 411-12.

While perhaps this Court has not decided the exact question presented by Olson, we have decided that evidence of mental condition as of several years before the commission of a crime, State v. Neel (1978), ____ Mont. ____, 580 P.2d 456, 459, 35 St.Rep. 833, 837, or as of several years after the commission of a crime, State ex rel. Main v. District Court (1974), 164 Mont. 501, 508-09, 525 P.2d 28, 32, is not sufficient evidence of mental condition at the time of the commission of a crime. The reverse is also true: evidence of mental condition at the time of the commission of a crime is not sufficient evidence of mental condition some eight years later upon petition for release. Powell v. Florida (5th Cir. 1978), 579 F.2d 324, 330.

We are reluctant, however, to hold that testimony of mental condition at the commission of a crime is always inadmissible on the question of mental condition at some point later upon petition for release. For example, under section 95-508(1), now section 46-14-301(2) MCA, a person committed to Warm Springs State Hospital following acquittal is entitled to a hearing within 50 days of confinement to determine his present mental condition. In such cases, the earlier testimony may be helpful to the District Court in

-6-

evaluating the acquittee's mental health. People v. Turner (1978), 62 Ill.App.3d 782, 379 N.E.2d 377, 379-80. As the interval between the original evaluation and the subsequent petition for release lengthens, however, this earlier testimony loses its probative value. In this case, where eight years elapsed between the original evaluation and the subsequent petition for release, with no intervening examination by the witness, the probative value of the earlier testimony of the witness in judging the present mental condition of Olson is questionable.

Our conclusion is strengthened by the other testimony and evidence in the record before the District Court. Included in this evidence were evaluations of Olson by other psychiatrists or psychologists. These evaluations, contrary to that of Dr. Wetzler, were based on examinations of Olson in late 1977 and early 1978 after his return to Warm Springs. The later evaluations are unanimous in their findings that Olson no longer suffers from any mental disease or defect and that he should be released from confinement at Warm Springs.

Thus, in the words of Dr. Hamilton Pierce:

"In summary, I see no evidence of mental illness in this patient and I doubt if he ever has had mental illness to the degree that could be considered a cause of his antisocial activities. He is an impulsive person and he has relatively weak controls which are weakened more by his tendency to drink. I do not see him as mentally ill now or in the past."

Dr. George Gelernter, also of Great Falls, concluded:

"At this point, I find no evidence of serious emotional illness. Incarceration at the State Hospital would seem to serve no purpose other than custodial, since there is no 'treatment' facility there that would be meaningful to him. If the legal aspects of his charges required incarceration, it would seem more appropriate at the State Prison in Deer Lodge if the purpose is purely incarceration."

Finally, the District Court had before it a packet of evaluations prepared by the psychiatric staff at Warm Springs. In these evaluations, the examining social worker, "question[ed] the appropriateness of [Olson's] current incarceration." The discharge summary signed by Dr. Harry Xanthopoulos and others states:

"Significant Findings:

"It was the findings of the Forensic Region team that he was suffering from no mental disorder and that he was not appropriately in the hospital. . ."

The final diagnosis of Olson by the staff at the State Hospital states that he has no mental disorder.

Comparison of the psychiatric testimony presented by the State with that presented by Olson leaves no possible conclusion other than that Olson has established by a preponderance of the psychiatric evidence that he is entitled to be released. Section 95-508(3), R.C.M. 1947, now section 46-14-302(4) MCA. We therefore proceed to an examination of the testimony of Karla White.

Testimony of Karla White. Unlike the testimony of Dr. Wetzler, the testimony of Karla White is not subject to attack on the basis that it is not timely or relevant. Her testimony concerns incidents involving Olson which occurred within about fifteen months of his filing a petition for release. One of these incidents resulted in Olson's arrest and return to Warm Springs. The testimony is undoubtedly damaging to Olson's case. See, People v. Giles (Colo. 1976), 557 P.2d 408, 412. Given our conclusion as to the current value of Dr. Wetzler's 1970 testimony, however, the question becomes whether White's testimony, standing alone, justifies Olson's continued confinement at Warm Springs. We conclude that it does not.

-8-

White, as noted earlier, testified concerning two separate incidents involving Olson which occurred a year apart. In the first incident, Olson appeared uninvited in White's bedroom in the early morning. He later explained he had been trying to rouse White for about an hour and when he failed, he called her mother who supposedly asked him to check on her. Olson did leave when told to by White. The circumstances of this incident and the manner of Olson's behavior possesses only a superficial similarity to his sexual attacks in 1970.

The second incident to which White testified was the time that Olson suddenly appeared as White was getting out of her car, knocked her down, and pushed her face into the concrete before dragging her to a nearby vacant field where he continued to press her face into the grass. White's recount of what Olson said to her during this attack is illuminating:

> "Q. What happened next? A. We more or less just were talking. He asked me if I knew why he was doing this to me, and if I wanted to know, and I said, 'Yes, I do.' He said he was doing it for my sister.
>
> ". . .
>
> "Q. What happened next? A. He told me that it was not me he was after anymore; that it was my husband, and that I should get up and run along towards the road and not turn around and just run." (Emphasis added.)

Again, there was no sexual assault or conduct of any kind. This incident also is very dissimilar to the earlier sexual attacks and apparently had for its motive not sexual assault but revenge for a friend apparently wronged. Cf. State v. Hesse (1977), 117 N.H. 329, 373 A.2d 345, 347 (defendant, acquitted of assault on a black man because of insanity, assaulted a black man after escape from hospital).

Olson was charged only with simple assault and unlawful restraint, both misdemeanors. Both charges were eventually dismissed.

White's testimony as well as Olson's special status at the time of the attack leads us to review the entire statutory scheme for the commitment and release of persons acquitted of crime because of mental disease or defect. Olson's special status of which we speak is that of an insanity acquittee on de facto self-imposed "probation" from Warm Springs for a period of over five years from the time he walked away from the State Hospital in August 1972, until his arrest on September 1, 1977.

Our review initially reveals a conflict in these statutes as to whether criminal or antisocial behavior alone warrants confinement at Warm Springs. The Revised Commission Comment to section 95-508, R.C.M. 1947, governing release states:

> ". . . It seems preferable to make dangerousness the criterion for continued custody rather than to provide that the committed person may be discharged or released when restored to sanity as defined by the mental hygiene laws. Although his mental disease may have greatly improved, such a person may still be dangerous because of factors in his personality and background other than mental disease. Also, such a standard provides a possible means for the control of the occasional defendant who successfully feigned mental disease to gain an acquittal. The prescribed procedure protects both the public and the defendant by providing for an independent psychiatric examination of the defendant before action on the application for release, and then either for summary favorable action on the application or a full hearing." (Emphasis added.)

This comment, as well as the language of section 95-508 itself, would seem to indicate that the mere fact of Olson's criminal assault on White is reason enough to warrant his continued confinement. The definition of mental disease or

defect excluding responsibility contained in section 95-501, R.C.M. 1947, now section 46-14-101(2) MCA, indicates otherwise:

> "(2) As used in this chapter, the term 'mental disease or defect' does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."

The conflict between these provisions is more apparent than real, however. Obviously, the intent of these statutes is to deal with an exceptional class of people who, because of their mental condition, are not to be held criminally liable for acts which otherwise would be considered criminal. State v. Taylor (1971), 158 Mont. 323, 331, 491 P.2d 877, 881. The crucial criterion for inclusion in this class is possession of a mental disease or defect excluding responsibility. Section 95-501, R.C.M. 1947, now section 46-14-101 MCA; Powell v. Florida (5th Cir. 1978), 579 F.2d 324, 332. Clearly, under this statute, the mere commission of a criminal act does not place the actor in this exceptional class; neither should the mere commission of a criminal act by a person once deemed to be a member of this class necessarily be construed as evidence of his continued inclusion in this class.

In Rouse v. Cameron (D.C. Cir. 1966), 373 F.2d 451, the Federal Court of Appeals was faced with a similar situation and a similar statutory scheme. That court concluded:

> ". . . A person involuntarily committed and confined under D.C.Code § 24-301 is entitled to release if he has 'recovered his sanity and will not in the reasonable future be dangerous to himself or others.' That the 'person so confined has some dangerous propensities does not, standing alone, warrant his continued confinement in a government mental institution under § 24-301 D.C.Code. The dangerous propensities . . . must be related to or arise out of an abnormal mental condition.'" 373 F.2d at 459. (Emphasis added.)

-11-

Accord, State v. Cuvelier (1978), 175 Conn. 100, 394 A.2d 185, 189.

In other words, the mere fact that a person may have once been acquitted on the basis of insanity does not forever after insulate him from the sanctions imposed under the criminal justice system in the event of future criminal or antisocial conduct, absent some evidence that his future conduct is somehow related to his mental disease or defect. People v. Dublin (1978), 63 Ill.App.3d 387, 380 N.E.2d 31, 35; Lee v. Kolb (W.D. N.Y. 1978), 449 F.Supp. 1368, 1382. In short, a sexual psychopath should not be able to rob a bank, for example, and be automatically immune from criminal punishment by virtue of his earlier diagnosed insanity. Neither should the fact that he robbed the bank automatically be taken as evidence of his continuing sexual psychopathy. There must be some demonstrated relation between the two types of behavior.

In this regard, the following discussion in Goldstein & Katz, Dangerousness and Mental Illness, 70 Yale L.J. 225, 237-38 (1960) is informative:

> ". . . what disposition is to be made of those acquitted by reason of insanity who remain dangerous--whatever meaning will be given to that word--but who have 'recovered sanity' at least to the extent that they could no longer be held had they been civilly committed?  Continued detention would be the statutory answer. But to hold a patient solely for potential dangerousness would snap the thin line between detention for therapy and detention for retribution. . . Not to release such persons would in effect be to equate an undefined 'dangerousness' with an undefined mental illness. Since there can be no such equation, a decision not to release solely on the basis of potential dangerousness would be like a decision not to discharge a tubercular patient--though no longer infectious--because he is a potential killer or check-forger . . ." (Emphasis added.)

Evidence that Olson's attack on White was related to his mental disorder diagnosed in 1970 is lacking in this case. In fact, had Olson first come to the attention of the police as a result of his attack on White and had he at that time chosen to rely on the defense of insanity, the defendant would have been unsuccessful because everyone who examined him found no evidence of mental disorder.

Instead the evidence is to the opposite effect. All of the psychiatric and psychological evaluations of Olson performed after his recommitment to Warm Springs were made with full knowledge of his attack on White. Even with this knowledge, these experts determined that Olson suffered no mental disorder as of the time of their examination.

In this connection, the provisions of section 95-508(4), R.C.M. 1947, now section 46-14-304 MCA, are relevant:

> "(4) If, within five (5) years after the conditional release of a committed person, the court determines, after hearing evidence, that the conditions of release have not been fulfilled and that for the safety of the person or for the safety of others his conditional release should be revoked, the court shall immediately order him to be recommitted to the superintendent of Warm Springs state hospital, subject to discharge or release only in accordance with the procedure prescribed above in subsections (2) and (3)."

As noted above, Olson's status at the time of his attack on White on September 1, 1977, was unique. He had walked away from Warm Springs in August 1972 and had lived in Great Falls for the next five years. During this period, Olson found a job, joined a union, joined the local Moose Lodge, and apparently established a more compatible, understanding relationship with his wife. The degree to which Olson fit into the community is attested to by the 35 personal reference letters from his employers, friends, and

co-workers admitted into evidence at the hearing. See, Hill v. State (Fla. App. 1978), 358 So.2d 190, 205.

In a very real sense, then, his status was that of a conditional, albeit self-determined, releasee, the condition frankly being that he avoid contact with the law. For the five-year period specified in section 95-508(4), Olson lived up to this condition.

We recognize, of course, that this section is not directly applicable to a person in Olson's status. Nevertheless, the intent of the legislature in enacting this section was to create a time limit beyond which the State cannot automatically revoke the release of a person once committed to Warm Springs and subsequently returned to the community. Olson did successfully live in Great Falls, under his self-imposed conditions, for longer than this statutory time limit. To take him from his successfully recreated life and return him to an indefinite confinement in Warm Springs on the sole basis of a misdemeanor assault charge carrying a maximum six month sentence offends this intent. Therefore, we think it was incumbent upon the State at this late date to have come forward with stronger evidence than was presented to show that Olson continues to suffer from a mental disorder requiring his renewed confinement at Warm Springs.

The State apparently assumed that it only had to show that Olson at one time had a mental disease or defect and that more recently he had committed an antisocial act without having to show a relationship between the two. This was an erroneous assumption. On the evidence presented thus far, Olson has shown by a preponderance of the evidence he is entitled to his release.

It is not the function of this Court, however, to direct the release of persons committed to Warm Springs State Hospital; that power belongs to the District Court. Section 95-508, R.C.M. 1947, now sections 46-14-301 through -304 MCA; Application of Zion (1978), ___ Mont. ____, 585 P.2d 1084, 1090, 35 St.Rep. 1475, 1482. Given the seriousness of the offenses for which Olson was originally committed, the fact that he has undergone no psychiatric treatment since the time of his "release" from the hospital, the two incidents involving Karla White, and the fact that the State proceeded on an erroneous assumption as to its burden of proof in the previous hearing, we conclude that this cause must be remanded for futher testimony on the specific question of whether Olson's antisocial behavior as illustrated in the incidents involving Karla White have any relationship to any mental disease or defect currently suffered by Olson. People v. Dublin (1978), 63 Ill.App.3d 387, 380 N.E.2d 31, 35; Application of Miller (1974), 46 A.D.2d 177, 362 N.Y.S.2d 628, 633-34. The point to be determined by the District Court is whether Olson's present "dangerousness," if any, is related to or growing out of the abnormal mental condition he exhibited in 1970.

The mere fact that Olson may have a tendency towards antisocial behavior is not sufficient to warrant his continued confinement in Warm Springs. See, Harris v. United States (D.C. 1976), 356 A.2d 630, 632. If Olson does not suffer from a mental disease or defect which causes this behavior, there is no reason for continuing to include him in the exceptional class of people discussed earlier. Baxstrom v. Herold (1966), 383 U.S. 107, 114-15, 86 S.Ct. 760, 764-65, 15 L.Ed.2d 620, 625-26. The ordinary punish-

-15-

ments of the criminal justice system are adequate to handle Olson's future criminal conduct, in such circumstances.

We also point out that the District Court is not limited to either recommit Olson to Warm Springs or release him unconditionally. Section 95-508 gives the District Court authority to release conditionally persons committed to the State Hospital by placing such conditions as it deems necessary on the release. But see, Application of Zion (1978), _____ Mont. _____, 585 P.2d 1084, 35 St.Rep. 1475. On remand, the District Court should not foreclose the possibility of conditional release as a proper means of balancing Olson's interest in liberty against society's interest in protection from potentially dangerous persons. Application of Zion, 585 P.2d at 1087, 35 St.Rep. at 1478; Hill v. State, 358 So.2d at 209.

The judgment of the District Court denying Olson's petition for release is reversed. The cause is remanded for further proceedings consistent with this opinion.

_____
                           Justice

We concur:

_____
        Chief Justice

_____

_____
        Justices

Mr. Justice John Conway Harrison dissenting:

I dissent. I am aware of the difficult problem faced by the majority, and perhaps the solution presented is the only one available. However, the time has come to focus on the absurd positions that courts are now put in when interpreting the mental condition of defendants in trying to determine their criminal liability.

Appellant, as noted in the opinion of the majority and in a prior case before this Court, is a known rapist. Prior to, and noted in our opinion in State v. Olson (1971), 156 Mont. 339, 480 P.2d 822, he was charged with an assault in a county adjacent to Lincoln County and allowed to plead to a lesser offense. The testimony of defense psychiatrists in the above case indicated that he was entitled to the provisions of sections 46-14-101 through 46-14-304 MCA (formerly sections 95-501 through 95-509, R.C.M. 1947). Dr. Wetzler indicated that he was a dangerous person who had:

> ". . . a grave defect, a grave illness, a serious problem of his inability to accept his own sexual feelings any more than you or I can perhaps accept or control hunger . . . I cannot predict the outlook. I would say it would be a grim and guarded one . . . Because of the long duration of his illness and particularly as we are again dealing with a personalities weakness, a personality defect . . . Because he is dangerous to be at large. He has no control at times. This is what we are talking about, his control, his defect, his illness. If he has shown these manifestations since 12, 14 years of age, and he is now what, 27, 28, plus the evidence of the Minnesota Multiphasic Test, we have conclusive proof that this man needs to be confined."

With this testimony before the court and available later for consideration by attending psychiatrists, and with little or no treatment at the State Hospital during the year he spent there, we now have testimony before us that he should have never been sent to the State Hospital. If that

-17-

is true, fraud was perpetrated on the court when it found appellant not guilty by reason of insanity. Had the trial court not accepted this testimony, appellant would have faced retrial and could have been convicted and sentenced to a long term in the State Prison--from which escape is considerably more difficult than it is from the State Hospital.

In addition I am disturbed that a patient at the State Hospital "designated as dangerous" can walk away from that institution, with no notification to the committing authorities, or to any of the law enforcement authorities in the State. The result is that we have such a person at large in the State for a five-year period. Somewhere in this case, we have a complete breakdown of responsibility to the people of this State. They are entitled to more protection-- particularly the women of this State--than has been exhibited here. Failure on the part of the State Hospital authorities to notify law enforcement officials evidences, in my opinion, gross negligence and a reckless disregard for the rights and safeguard of the public.

As a result of such actions by state officials in other jurisdictions, persons injured by such inmates, or their survivors, are seeking redress against the state for injuries done by the inmate while at large. 2 Restatement of Torts 2d gives guidance on the issue of the duty owed any members of boards or the responsible officials at institutions who release such persons. Section 319, "Duty of Those in Charge of Person Having Dangerous Propensities" states:

> "One who takes charge of a third person whom
> he knows or should know to be likely to cause
> bodily harm to others if not controlled is
> under a duty to exercise reasonable care to
> control the third person to prevent him from
> doing such harm."

-18-

The illustrations to Section 319 involve the negligent release of an infectious patient from a private hospital with an infectious disease (based, _inter alia_, on Missouri, K & T. R. Co. v. Wood (1902), 95 Tex. 223, 66 S.W. 449) and the escape of a homicidal maniac patient due to the negligence of guards employed by a sanitarium (based, _inter alia_, on Austin W. Jones Co. v. State (1923), 122 Me. 214, 119 A. 577).

The State asserts it used Wetzler's 1970 testimony because Wetzler was out of state, residing in the State of Washington, where he has his practice, and was therefore not available to testify. In fact, Dr. Wetzler has retired and his records are not available at this time.

I believe the transcribed testimony was clearly admissible under section 95-1802(e), R.C.M. 1947, now section 46-15-204 MCA, which provides that the sworn transcribed testimony of a witness, that the defendant has been able to cross-examine, is admissible if the witness is out of the state. State v. LaCario (1974), 163 Mont. 511, 518 P.2d 982; State v. Bouldin (1969), 153 Mont. 277, 456 P.2d 830; and State v. Zachmeier (1969), 153 Mont. 64, 453 P.2d 783.

As to the presumption of continuing insanity, Montana recognizes the common law presumption that insanity, once proved, is presumed to exist. Appellant's assertion that the presumption ends after five years is wholly unfounded. Presumption must be judged on a case-by-case basis; the inference steadily diminishes in force with the lapse of time at a rate proportionate to the quality of the permanence belonging to the thing in question until it ceases. Sommer v. Wigen (1936), 103 Mont. 327, 62 P.2d 333; People v. Baker (1954), 42 Cal.2d 550, 268 P.2d 705; State v. Garver (1950), 190 Or. 291, 225 P.2d 771.

The State was required to prove that Olson's insanity was permanent and continuing. Wetzler's testimony clearly went to that question. The State was not trying to pass the testimony off as evidence of Olson's condition at the time of the hearing but as testimony concerning Olson's former condition which was to serve as an explanation of his current actions.

Olson was diagnosed in 1970 as having a mental problem of long standing for which he was ordered to be confined and treated. Yet one year after his commitment, Olson escaped from Warm Springs and for the five years between 1972 and 1977 received no treatment. Thus, appellant has been essentially untreated for this grave illness; a presumption that it continues is appropriate.

The State does not believe that the original testimony on insanity is always sufficient to keep the person confined. It was the combination of Wetzler's testimony, the attack on White, and the fact that Olson had received no treatment which made the State's case.

As to the use of Karla White's testimony, there was substantial similarity between the 1969 rapes committed by Olson, the 1977 attack on White, and the 1976 appearance by Olson in White's bedroom. While no sexual assault took place, there may have been one had not the police intervened in one incident or White not had a male companion in the other.

The 1969 rapes took place at night when the victims' husbands were away and after Olson had threatened to harm their children. The attack on White also occurred at night, and appellant had inquired as to the whereabouts of her child and husband.

Olson was required to prove that he was entitled to release by a preponderance of the evidence. Appellant produced evidence that he is not mentally ill and that he has adjusted to community and family life. The State, on the other hand, produced evidence that appellant was diagnosed in 1970 as having a grave and serious mental illness, that he had raped two women in 1969, and that he had perpetrated an attack upon a woman in 1977 that was similar, as far as it went, to the earlier rapes. The evidence also showed that appellant had received essentially no treatment for his mental illness. Upon this record, the District Court was entirely justified in determining, as it did, that appellant had not shown an entitlement to release by a preponderance of the evidence.

Even ignoring the transcript of Wetzler's testimony, the evidence shows that Olson was a physical danger to others in 1970 and remained so in 1977. As stated in the Revised Commission Comment to section 95-508, R.C.M. 1947, now sections 46-14-301 through 46-14-304 MCA:

> ". . . It seems preferable to make dangerousness the criterion for continued custody rather than to provide that the committed person may be discharged or released when restored to sanity as defined by the mental hygiene laws. Although his mental disease may have greatly improved, such a person may still be dangerous because of factors in his personality and background other than mental disease. Also, such a standard provides a possible means for the control of the occasional defendant who may be quite dangerous but who successfully feigned mental disease to gain an acquittal. . ."

This comment is particularly appropriate in the present case based on White's uncontroverted testimony.

I would affirm the District Court.

_____
                    Justice

-21-